UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PERCY SHAW,                   CIVIL ACTION NO.
                              2:11-cv-00539
          Plaintiff,
                              JUDGE FELDMAN
VERSUS

WAL-MART LOUISIANA,           MAGISTRATE CHASEZ
L.L.C.

          Defendant.

*******************************************

     Deposition of PERCY RAY SHAW, 17489

BLOSSOM TRAIL DRIVE, PRAIRIEVILLE,

LOUISIANA, 70769, taken at the Law Offices

of Charlotte McDaniel McGehee, 6513

Perkins Road, Baton Rouge, Louisiana,

beginning at or about 10:00 a.m. on

Thursday, the 6th day of October, 2011.

*******************************************

42b36050-e494-40fc-b446-c4ca426e2e0f

EXHIBIT A

1   thirteen.

2   Q.    So Kendrell lives with you then?

3   A.    Yes, sir.

4   Q.    All right.  And the other two?

5   A.    They still live with me.

6   Q.    Oh, all of them still live with

7   you?

8   A.    Yes, sir.

9   Q.    Okay.  What's your address?

10  A.    17489 Blossom Trail, Prarieville,

11  Louisiana.

12  Q.    Okay.  Do you own that?

13  A.    Yes, sir.

14  Q.    How long have you lived there?

15  A.    Going on five years.

16  Q.    Where were you before that?

17  A.    I lived off of Green Tree Drive in

18  Baton Rouge.

19  Q.    Now when you left Grambling did you

20  go to work then?

21  A.    I was working for Wal-Mart at that

22  time.

23  Q.    You were working for Wal-Mart then.

24  A.    Yes, sir.

25  Q.    Okay.  Now I know you started

42b36050-e494-40fc-b446-c4ca426e2e0f

1    working for Wal-Mart in 1986.

2    A.    '86, October 7th.

3    Q.    Okay.  How do you know that date?

4    A.    It just -- Well, because you got to

5    keep up with your anniversary; plus, you

6    get them pins, like five year pin, ten

7    year pin.  That's something you look

8    forward for.

9    Q.    So you would always get your pin the

10   week of the LSU/Florida game.

11   A.    Yeah.

12   Q.    Now where did you work before

13   Wal-Mart?

14   A.    Howard Brothers.

15   Q.    And what kind of store is that?

16   A.    It's, sort of, like Wal-Mart.

17   Q.    That was in Winnsboro?

18   A.    Yes, sir.

19   Q.    How long did you do that?

20   A.    A little over two years -- two

21   years.  A little over two years.

22   Q.    Okay.  And then they went out of

23   business?

24   A.    Yes, sir.

25   Q.    What were you doing there?

1    A.    I was a janitor doing floors.

2    Q.    Did you have any injuries while you

3    were there, any work related injuries?

4    A.    No, sir.

5    Q.    Okay.  Any kind of problems while

6    you were there?

7    A.    No, sir.

8    Q.    All right.  Now you were hired by

9    Wal-Mart on October 7th, '86.  Where was

10   that, Winnsboro?

11   A.    Winnsboro, yes, sir.

12   Q.    Now were you in -- Let's see.  You

13   graduated in '84?  You graduated in '84;

14   right?

15   A.    I think it was '84, '84 or '86.

16   Q.    Okay.  After graduation is that when

17   you started working for --

18   A.    Yeah.  I started working for --

19   Q.    -- Howard --

20   A.    -- Howard Brothers.

21   Q.    Okay.  So after Howard Brothers,

22   immediately, that's when you got on at

23   Wal-Mart?

24   A.    Yes, sir.

25   Q.    All right.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 15

1   A.    Matter of fact, I worked for

2   Wal-Mart two weeks before Howard Brothers

3   locked their doors.  Now I worked at a

4   gin, too, after I graduated.

5   Q.    What was it called?

6   A.    Donell Gin.  You know, where they

7   process cotton?

8   Q.    Uh-huh (affirmative response).

9   A.    I worked there, too.  It was just

10  season work.

11  Q.    Now you became a store manager in

12  July of 2005; is that right?

13  A.    I can't remember what day I became a

14  store manager.

15  Q.    Okay.  According to your records, it

16  looks like it was about nineteen years

17  after you started at Wal-Mart.  Does that

18  sound about right?

19  A.    Sound about right.

20  Q.    Okay.  Why don't you take me through

21  your employment history, just briefly?

22  You started off as an hourly associate --

23  A.    Yes, sir.

24  Q.    -- in Winnsboro.  Just, kind of,

25  very briefly take me through.

42b36050-e494-40fc-b446-c4ca426e2e0f

1    evaluations.

2    Q.    Can you remember being coached for

3    anything?

4    A.    Before I got promoted?

5    Q.    Right.

6    A.    Can't remember.  Can't remember.

7    Q.    Now you're familiar with the

8    Coaching For Improvement Policy at

9    Wal-Mart; correct?

10   A.    Oh, yeah.  Yeah.  Yes.  I'm familiar

11   with that.

12   Q.    And just real briefly how does that

13   work?

14   A.    Well, if you get coached I know you

15   can't get promoted to a store manager, so

16   I assumed I didn't get coached.

17   Q.    All right.  Well, the coaching lasts

18   a year; correct?

19   A.    Yeah.  It lasts a year.  Exactly.

20   Q.    You start off with a verbal?

21   A.    Start off with you get a verbal,

22   which then you get a written, after you

23   get a written you get a Decision Making

24   Day, and then you come back, you gotta

25   write some -- you gotta write a letter

42b36050-e494-40fc-b446-c4ca426e2e0f

1   saying why you think you need to keep your

2   job and stuff.

3           Then another violation -- Another

4   violation is termination or demoted.  You

5   can go either/or.  Some case you get

6   terminated, some case you don't.

7   Q.    And that's a day off with pay, a

8   Decision Making --

9   A.    Yeah, a day off with pay.

10  Q.    And it lasts one year?

11  A.    Yes, sir, which I didn't get it.

12  Q.    Excuse me?

13  A.    Yeah, one year.

14  Q.    Now you have a decision day, you get

15  any other coaching for anything else you

16  can be terminated.

17  A.    Yeah.  You can be terminated.

18  Q.    All right.

19  A.    Up to termination.

20  Q.    Now you said you can also have the

21  option to be demoted?

22  A.    The District Manager can have the

23  authority to tell you either take it to

24  the next level or they can demote you.

25  Q.    On a Decision Making Day.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   against; is that right?  Is that what your

2   understanding of that policy is?

3   A.     That's what I understand it's

4   suppose to be.

5   Q.     Okay.  Now when you were promoted to

6   Store Manager who was it that promoted

7   you?

8   A.     I can't recall his name.

9   Q.     Do you know if it was a District

10  Manager?

11  A.     It was a District Manager.

12  Q.     And when you went to Algiers then as

13  the Store Manager would that have been

14  your same District Manager?

15  A.     No.  It was a different district.

16  Well, Janie the one that interviewed me.

17  Q.     Janie McNeill?

18  A.     Yeah.  She the one that interviewed

19  me.

20  Q.     But it wasn't her say about you

21  coming into her district?

22  A.     Yeah, it's her say.

23  Q.     Okay.

24  A.     Yeah, it's her say.

25  Q.     So she was your DM.  Was she your DM

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 38

1   Q.    All right.  So, basically, anytime

2   either a customer or an Associate got hurt

3   at the store --

4   A.    You had to report it.

5   Q.    -- you had to report it within 24

6   hours, a manager had to key it into the

7   system, --

8   A.    Uh-huh (affirmative response).

9   Q.    -- and then you would have a

10  conference with the Market people.

11  A.    No.  We would -- Conference call was

12  a regular basis.  We'd have one once a

13  week and that's just stuff we'd talk

14  about.

15  Q.    You wouldn't have a special

16  conference call.

17  A.    No, no.

18  Q.    It would just be what you discuss

19  that week, we had an accident.

20  A.    Yeah.  What went on that week, had

21  an accident.  That just part of the

22  conversation, the, uh, the conference

23  call.

24  Q.    Okay.  And, again, while you were

25  the Store Manager you're not aware of any

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 44

1   A.    No.  This didn't have nothing to do

2   with it.

3   Q.    Okay.  All right.  Now in May of '09

4   you moved to Slidell to be the Co-Manager.

5   A.    Yes, sir.

6   Q.    All right.  How did that come

7   about?

8   A.    I was called into the Market Office

9   with Janie and Roland.

10  Q.    Roland Dixon?

11  A.    Dixon, yeah.

12  Q.    What was Roland's position?

13  A.    He's the HR person.

14  Q.    Okay.

15  A.    As I went into the office, Janie sat

16  me down, start speaking to me about some

17  issues that we had in the store.  One of

18  the Market guys had came in my store that

19  Saturday evening and took some pictures of

20  the condition of the store and she

21  presented to show me the pictures of the

22  store, how the store looked, and she ain't

23  like the way the store was going so she

24  decided to coach me, which she did.  And,

25  at that time, when she coached me, I asked

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 45

1    to step down to go back as a Co where I

2    can develop myself more.

3    Q.    Okay.  You asked to be --

4    A.    Yeah, I asked her.

5    Q.    Did you agree that the pictures

6    accurately reflected what was going on?

7    A.    Oh, yeah.  The pictures speak for

8    themself.

9    Q.    Right.

10   A.    At that time, I asked her to go step

11   down as a Co.

12   Q.    Now, were you coached at that

13   point?

14   A.    Yes.  Yes, she had coached me.

15   Q.    All right.  What level of coaching

16   did you get at that point?

17   A.    It was a D Day.

18   Q.    All right.  So does that mean you

19   had previous coachings --

20   A.    Yes, sir.

21   Q.    -- before that?

22   A.    Uh-huh (affirmative response).

23   Q.    Okay.  And those previous coachings

24   were also fair?

25   A.    Oh, yes, sir.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.    Okay.  Do you know whether you would

2   have been demoted at that point?

3   A.    I don't think so.  I didn't want to

4   find out, so I decided to just step down

5   myself where I can better myself where I

6   can move back up, so I decided to take

7   that approach myself.  After she finished

8   and I asked her right then "Can I step

9   down?"

10  Q.    So it was your understanding, at the

11  point you got the D Day, that any other

12  coachings that followed over the next year

13  could result in your termination.

14  A.    It could lead up to termination.

15  Q.    Right.  How long did this meeting

16  with Janie last?

17  A.    It didn't last that long.

18  Q.    And you just decided right then

19  during the meeting that that's what you

20  were going to do?  In other words, you

21  hadn't thought about this before?

22  A.    No.  I hadn't thought about it at

23  all.  I just made it on the spot, you

24  know, asked her, "Can I step down, go back

25  as a Co?"

Page 47

1   Q.    And the intent was to develop

2   yourself and then --

3   A.    Develop myself.

4   Q.    -- eventually --

5   A.    Move back up.

6   Q.    -- move back.  Did they, at that

7   point, agree, or did they say we'll think

8   about it and get back to you?

9   A.    She made a phone call to somebody

10  and it was agreed.

11  Q.    Were you told right then where you

12  would go?

13  A.    No.  I told her where I'd like to

14  go.  I told her I'd like to go to

15  Slidell.

16  Q.    Why was that?

17  A.    Because every report you look at

18  they always had good numbers, always had

19  good reports.

20  Q.    Did you know anybody at the Slidell

21  store?

22  A.    Yeah.  I knew the Store Manager.

23  Q.    That was Dalton?

24  A.    Yeah.  I knew him because I was a

25  Store Manager and he and I were in the

42b36050-e494-40fc-b446-c4ca426e2e0f

1   same district.

2   Q.    Now were you in the office when

3   Janie made the call --

4   A.    Yes, sir.

5   Q.    -- to Dalton?

6   A.    No, no, no.  She didn't call Dalton.

7   She called some -- I guess her boss, her

8   her people that she talk to.  She didn't

9   call Dalton at all.

10  Q.    Okay.

11  A.    I guess whoever she called just say

12  was it okay to do it or not.

13  Q.    So, at the end of that meeting,

14  basically, you were told, yes, you can go

15  be a Co-Manager at Slidell?

16  A.    No, I wasn't told exactly.  No, I

17  wasn't told yes or no.  I just

18  requested.

19  Q.    All right.  Did you fill out some

20  type of formal paperwork for that or you

21  just asked them verbally?

22  A.    I just asked them verbally.

23  Q.    All right.  You never did fill out a

24  transfer form?

25  A.    No.  I just asked them verbally

42b36050-e494-40fc-b446-c4ca426e2e0f

1    because I would like to go to Slidell.

2    Q.    How long did it take before they

3    granted the request?

4    A.    We had to go through a interview

5    process.  I can't recall how long, but we

6    had to go through a interview process.

7    Q.    Would it have been a few weeks?

8    A.    I can't recall how long, but --

9    Q.    Who did you interview with, do you

10   remember?

11   A.    Dalton for sure, and Roland, the HR

12   person.

13   Q.    In other words, you interviewed with

14   Roland after your meeting with Roland and

15   Janie?

16   A.    After they start the interview

17   process.

18   Q.    Can you remember anybody else?

19   A.    No, sir.

20   Q.    All right.  Now, did you know there

21   was a position available in Slidell at

22   that time, or you just wanted to go to

23   that store because of its numbers?

24   A.    I knew there was a position

25   available at that time, and that's the

42b36050-e494-40fc-b446-c4ca426e2e0f

1    reason why I asked to step down, too.

2    Q.    How did you know?

3    A.    They always post it when there's a

4    position open, and you can go on the

5    computer and see it.

6    Q.    Do you know how many other people

7    were competing with you for that

8    position?

9    A.    I think two more, two others.

10   Q.    And when you went to Slidell, when

11   they granted the transfer, how did your

12   compensation change?

13   A.    Went from a hundred, uh, a hundred

14   and twenty to sixty-six, somewhere between

15   there, sixty-seven thousand, somewhere up

16   in there.  Between a hundred and ten, a

17   hundred and twenty as a Store Manager to

18   sixty, just sixty-six, somewhere up in

19   there.

20   Q.    Now who was your other Co-Manager

21   there at Slidell?

22   A.    Well, they have four.  They had

23   Felicia, they had Brad, and they had --

24   They had one more.  I can't think of his

25   name.  There were four of us altogether.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 52

1    Q.    Do you remember any of the

2    details?

3    A.    I can't remember.

4    Q.    All right.  I'm going to mark as

5    Shaw Number 2 a copy of a December 10th,

6    2005 --

7    A.    Yeah.  I remember this one.

8    Q.    -- written -- Okay.  "Percy allowed

9    the xbox 360 to be sold to an Associate

10   prior to opening the store and offering

11   the merchandise to the customer for sale."

12   A.    And when I just got promoted.

13   Q.    All right.  Okay.

14   A.    When I just got promoted.

15   Q.    All right.  And Janie McNeill gave

16   you the --

17   A.    Coaching.

18   Q.    Right.  And it was accurate that

19   the --

20   A.    The Associate did buy the Xbox.

21   Q.    Right.  I'm going to mark as Exhibit

22   Number 3 a April 22nd, 2008 coaching,

23   which is a verbal.  "Inventory flow

24   process not being run 100 percent."

25   Again, that was given by Janie McNeill and

42b36050-e494-40fc-b446-c4ca426e2e0f

1    Richard York.  Do you know who --

2    A.    That's Mike York.

3    Q.    That's Mike York?  Okay.  And do you

4    recall this?

5    A.    Yes, sir.

6    Q.    All right.  And this was accurate?

7    A.    Yes, sir.

8    Q.    All right.  I've marked as Number 4

9    a Coaching For Improvement dated October

10   2nd, 2008, and this was a written.

11   "Unbeatable Excellence conducted on 30th

12   was 72 percent which is an unacceptable

13   rating.  Store standards must improve and

14   backroom process must be implemented.

15   Merchandise on trailers must be seasonal

16   only."  Again, we talked about --

17   A.    Yeah.

18   Q.    This was fair and accurate?

19   A.    Yes, sir.

20   Q.    Okay.  And I've marked as Number 5,

21   a Copying For Improvement dated April

22   10th, 2009, and this was a Decision Day.

23   And this is what we were just talking

24   about when you were called into the

25   meeting with Roland and Janie, and this

Page 54

1   was the meeting where you said you wanted

2   to --

3   A.    Yeah.  You can see where I put in

4   there to go back as a co.

5   Q.    Right.  Okay.  So this is an

6   accurate reflection of what they talked to

7   you about at the meeting and what you did.

8   A.    Uh-huh (affirmative response).

9   That's when I asked can I go step down.

10  Q.    Okay.  Gotcha.  And, again, up to

11  the point where you requested in this

12  meeting to move to Slidell, you had no

13  problems or issues with anyone from the

14  Market Office during your tenure as Store

15  Manager; is that right?

16  A.    No, sir.

17  Q.    Okay.  In other words, no unfair

18  treatment, no problems like that.

19  A.    I had no problem.

20  Q.    Okay.  Now you go to Slidell in May

21  of 2009.  That sound about right?

22  A.    That sounds about right, yes, sir.

23  Q.    Okay.  And, at this point, you never

24  worked with Dalton.  You just know him

25  from the meetings.  Do you know whether

Page 55

1    Dalton had any input into your being

2    chosen to be the Co-Manager over the other

3    applicants?

4    A.    I don't know if he had input or

5    not.

6    Q.    All right.  So you don't really know

7    who was involved in the decision.

8    A.    Yeah, who really signed off on it.

9    Q.    Okay.  Now while you were at Slidell

10   for that ten months, roughly, before you

11   were terminated, did you receive any

12   evaluations?

13   A.    I can't recall.  I can't recall.

14   Q.    And, obviously, you didn't receive

15   any coachings until the final coaching --

16   A.    Yes, sir.

17   Q.    -- and that was your termination.

18   All right.  What about problems that you

19   had or issues that you had?  You said you

20   had some problems with Dalton.  Did you

21   have an issue or problem with anybody

22   besides Dalton?

23   A.    Just him.

24   Q.    Just Dalton.  All right.  Do you

25   know how long he'd been the manager there?

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Had he been the manager for some time?

2   A.    I don't know how long.

3   Q.    When did the problems with Dalton

4   start?  Tell me how that happened.

5   A.    It actually started when I worked in

6   the store overnight, the biggest, when I

7   started working overnight.

8   Q.    Do you know about when that was, --

9   A.    No, sir.

10  Q.    -- how long you'd been there?

11  A.    No, sir.

12  Q.    All right.  So when you first

13  started you were working days?

14  A.    Yes, sir.

15  Q.    And Dalton was there during the

16  days?

17  A.    Yes, sir.

18  Q.    All right.  And everything was

19  fine?

20  A.    Yes, sir.

21  Q.    All right.  And then when you

22  switched over to nights was that something

23  that you asked to do or were you asked to

24  go to nights?

25  A.    No.  That was something they did.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.   Did they switch all the managers

2   around?

3   A.    No, sir.  No, they did not.

4   Q.   Okay.  How was it that the night

5   position opened that you were moved to it?

6   Did somebody get moved off of nights, or

7   transferred away, or do you know how that

8   happened?

9   A.    I think they swapped the managers.

10  No.  That's when they was going to put two

11  Co's overnight.  That's when they changed.

12  They put two Co's overnight.

13  Q.   All right.  So before they had one.

14  A.    They had one.  They put two Co's

15  overnight.  Yeah, they put two Co's

16  overnight.

17  Q.   Any idea when that was?

18  A.    No, sir.

19  Q.   Was this something that came down

20  from --

21  A.    Headquarters.

22  Q.   -- headquarters?  Okay.  And how

23  were you picked to be the one to go

24  overnight?

25  A.    I guess the Store Manager picked

42b36050-e494-40fc-b446-c4ca426e2e0f

1    me.

2    Q.    All right.

3    A.    Can I backtrack a little bit?

4    Q.    Sure.

5    A.    Yeah.  We did have a couple of

6    issues during the day.

7    Q.    Okay.

8    A.    Yeah, we did, me and him, we did

9    have a couple of issues during the day.

10   Q.    What happened?  Can you remember?

11   A.    Uh, he -- One issue he, kind of,

12   feel that I tried to undermine him.  As a

13   Co-Manager you try to run the store as

14   well.  And I made a decision to -- I had

15   one of the other managers to call Janie,

16   see can we put some merchadise on the

17   trailer.  And he got mad, very mad, about

18   that and feel I tried to undermine him,

19   which I didn't, because we couldn't even

20   walk in Receiving it was so full.

21   Q.    Okay.  And can you think of any

22   other incidents that occurred before you

23   went to nights?

24   A.    That's the one I remember fresh.  A

25   couple more, but I can't remember exact,

42b36050-e494-40fc-b446-c4ca426e2e0f

1  no.

2  Q.    And after that incident did it hurt

3  your relationship with Dalton, or did you,

4  kind of, get over it, did he get over

5  it?

6  A.    The relationship didn't get no

7  better.

8  Q.    So that, kind of, hurt things from

9  that going forward?

10 A.    Yes, sir.

11 Q.    And, in terms of how the

12 relationship was hurt, would you say that

13 it was just you weren't as friendly from

14 that point forward?

15 A.    I just didn't feel comfortable.

16 Q.    You didn't feel comfortable with him

17 after that?

18 A.    Yeah.

19 Q.    Did you complain to anybody at that

20 point?

21 A.    Yes, sir.  I used the Open Door with

22 Janie.

23 Q.    At that point, during that daytime

24 thing, or you said it was after you went

25 to nights?

42b36050-e494-40fc-b446-c4ca426e2e0f

1  A.    Well, I used -- Janie wound up

2  working during the day.  That's Janie.  I

3  used the Open Door with her.

4  Q.    Okay.  So for that incident about

5  the undermining?

6  A.    It wasn't about that incident.  It

7  was all other stuff.  I can't recall what

8  I talked to her about.  I know I went to

9  the office and she was in the office and

10  and Roland was in the office when I talked

11  to her.

12  Q.    How many times did you use the Open

13  Door about Dalton --

14  A.    Twice.

15  Q.    -- with Janie?

16  A.    Well, one time with Janie.

17  Q.    One time with Janie.  And,

18  basically, what do you remember about

19  that?

20  A.    Just how he talked to us, how he

21  treated us.  He treated us with no

22  respect.

23  Q.    Us meaning you and the other --

24  A.    -- Managers, yes.

25  Q.    -- managers?  Did other managers

Page 61

1    come complain with you too?

2    A.    No.  I was just by myself.

3    Q.    Okay.  But you just -- Specifically,

4    like, what can you think of that he would

5    -- He just wasn't very nice in the way

6    he --

7    A.    Like, he downgrades you on the floor

8    in front of other Associates and stuff

9    like that.

10   Q.    And he did that to you and others?

11   A.    Yes, sir.

12   Q.    And what happened as a result of

13   your complaint?

14   A.    They never got back with me, so I

15   don't know.

16   Q.    They just never got back to you.

17   A.    No, sir.

18   Q.    And then you were switched to

19   nights.

20   A.    Yes, sir.

21   Q.    And then what happened then on

22   nights?

23   A.    Pretty much the same, no --

24   disrespect, downgrading in front of

25   Associates, pretty much the same thing.

Page 62

1   Q.    Again, you and the other night

2   managers?

3   A.    Yes, sir.  Well -- Yeah, the other

4   night managers.

5   Q.    Can you think of anybody else that

6   he also wasn't respectful to at night or

7   during the day?

8   A.    All the ones that worked with me.

9   Q.    Basically, all of them?

10  A.    Yeah.

11  Q.    Okay.

12  A.    Only one that didn't do no wrong,

13  but everybody else pretty much, you know.

14  Q.    So he had a problem with everybody.

15  A.    Pretty much.

16  Q.    All right.  And when you were

17  working at night were you having much

18  contact with Dalton at that point?

19  A.    No, sir.  I had no contact with him

20  at all hardly until that morning when he

21  come and walked the store and that's when

22  -- You know, we walk the store before we

23  leave.

24  Q.    I see.  Okay.  So at night you're

25  fine, but he comes in in the morning and

42b36050-e494-40fc-b446-c4ca426e2e0f

 1    says I don't like the way you did this,

 2    this, and this, and he does that in front

 3    of other people.

 4    A.    Yes, sir.

 5    Q.    To you and to the other managers.

 6    A.    Right.

 7    Q.    So do you remember how long you were

 8    working at night?

 9    A.    No, sir.

10    Q.    Did you work at night for the rest

11    of the time --

12    A.    Yes, sir.

13    Q.     -- that you were at Slidell?

14    A.    Yes, sir.

15    Q.    Okay.  Does your pay go up when you

16    work at night?

17    A.    No, sir.  It stayed the same.

18    Q.    So, at some point then, after you're

19    working at night for a while, and this is

20    going on, you went and complained again?

21    A.    Yes, sir.

22    Q.    Who did you complain to at that

23    point?

24    A.    Byron Beck.

25    Q.    Who is Byron?

1   A.    The other District Manager.  They

2   realigned the district, so he picked up

3   that district.

4   Q.    So he took over from Janie, Byron

5   Beck?

6   A.    Yes, sir.

7   Q.    Any idea when?

8   A.    No, sir.

9   Q.    And the district office was still in

10  New Orleans?

11  A.    No.  I want to say Covington.  It

12  wasn't in New Orleans no more.

13  Q.    They moved to Covington?

14  A.    No.  We had a district office.  That

15  was Janie's district office, but Byron had

16  his own.

17  Q.    Oh.  So they just changed over

18  districts so Janie was still in New

19  Orleans --

20  A.    Yeah.

21  Q.    -- but now you were under Byron's

22  district.

23  A.    Byron Beck, yes, sir.

24  Q.    So you went to the district office

25  to complain --

42b36050-e494-40fc-b446-c4ca426e2e0f

1   A.    Yes, sir.

2   Q.    -- to Byron.  What did you tell

3   him?

4   A.    Pretty much the same thing, how he

5   was disrespecting people.

6   Q.    And was anybody else there?

7   A.    The HR person.  I can't think of her

8   name.

9   Q.    Jahaine?

10   A.    Jahaine, yeah.  Jahaine.

11   Q.    Now this is like a meeting that you

12   had scheduled beforehand?

13   A.    Yes, sir.  When we first talking

14   about the Open Door, this is using the

15   Open Door.

16   Q.    All right.  So, again, this was your

17   second time then using the Open Door.

18   A.    Yes, sir.

19   Q.    Had you ever used the Open Door

20   before at Wal-Mart?

21   A.    No, sir, never.  Never.

22   Q.    All right.  And what happened as a

23   result of --

24   A.    They never did get back with me, so

25   I don't know.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.    Did you ever follow back up with

2   them?

3   A.    No, sir.  I thought it was their job

4   to follow-up with me once I opened it.

5   Q.    Do you know about how long it was

6   between the time you went and complained

7   about Dalton to the time that you were

8   terminated?

9   A.    No, sir.

10  Q.    All right.  Was there anything that

11  happened between, like, up to the point

12  that you got that last coaching and you

13  were terminated, was there anything that

14  happened between you and Dalton, or it was

15  just, kind of, all the same --

16  A.    All the same.

17  Q.    -- that it had always been?

18  A.    Always been.

19  Q.    Okay.  So, basically, from not too

20  long after you got to Slidell you started

21  having problems with Dalton and the way he

22  treated you and the other Assistants.

23  A.    Yes, sir.

24  Q.    And that just, pretty much, went on

25  up until the point that you left.

1   A.    Yes, sir.

2   Q.    All right.  And you don't know

3   whether other Assistants also complained

4   about Dalton.  You wouldn't have any way

5   to know whether they complained about him,

6   or do you?

7   A.    I only know one that told me that he

8   complained.

9   Q.    You did.  Okay.

10  A.    An Assistant that told me he did,

11  that he used the Open Door.  That's all I

12  know.

13  Q.    Who was that?

14  A.    It was -- I call him Ron.  Ron,

15  that's what I call him.

16  Q.    Okay.  You don't know his --

17  A.    I can't get his last name, but I

18  called him Ron.

19  Q.    He was a Co or --

20  A.    Assistant.

21  Q.    Okay.  And he just told you?

22  A.    Yeah.  He just told me.

23  Q.    And, again, that was the same thing

24  that you had complained about, just that

25  he was disrespectful and he talked --

1   A.    Pretty much.

2   Q.    -- down to people in front of

3   others and all that?

4   A.    Pretty much.

5   Q.    Do you know whatever happened with

6   Ron's --

7   A.    No, sir.

8   Q.    -- Open Door?

9   A.    No, sir.

10  Q.    Do you know whether Ron is still

11  there?

12  A.    I don't know.  I mean, I -- He was

13  there when I left, so I don't know if he's

14  still there or not.  No, sir, I don't

15  know.

16  Q.    Could you describe him?

17  A.    Skinny guy.

18  Q.    How old?

19  A.    Uh, he -- He's white, skinny, kind

20  of bald right there.  I'm 46.  I don't

21  know how old he is.

22  Q.    All right.  But, at the point he

23  Open Doored, it was to Byron.  Byron was

24  the District --

25  A.    I don't know who he Open Doored to.

1    I don't know if he did Byron or Janie.  I

2    don't know.

3    Q.    Okay.  So everything's just, kind

4    of, going along and you're working in

5    Slidell.

6    A.    Yes, sir.

7    Q.    When did you find out that there was

8    a problem that you had -- you were going

9    to be coached for something, you had done

10   something?

11   A.    I didn't know I was going to be

12   coached.  That's something I didn't

13   know.

14   Q.    All right.  Well, what happened?

15   Tell me what happened, how you first found

16   out that you were in trouble.

17   A.    When I first found out I was in

18   trouble?  Well, I didn't know I was in

19   trouble.  I just -- It was surprising to

20   me.  I didn't know.

21   Q.    Okay.  Tell me what happened.

22   A.    Okay.  Uh, on the coaching process,

23   basically, a customer had an accident and

24   Stephen, which is Support Manager, was in

25   there with me, Stephen.

42b36050-e494-40fc-b446-c4ca426e2e0f

1    Q.    Stephen --

2    A.    Stephen.  He's a Support Manager,

3    Overnight Support Manager.

4    Q.    All right.  Hourly Support Manager?

5    A.    Yes, sir.  He was there with me.

6    Ron suppose to work at night, but he was

7    sick.  He was sick.  And I had Stephen to

8    go take care of that issue because -- had

9    Stephen to go take care of that

10   circumstance, which he did.  And, uh, and

11   we worked all through the night.  So that

12   morning before I left I got with Jamie.

13   Q.    Who?

14   A.    Jamie, the Assistant Manager.  His

15   name is Jamie.  I asked Jamie to key in,

16   could he key in an accident for me.  And,

17   uh --

18   Q.    Jamie's a male or a female?

19   A.    A male.  I asked him to key in an

20   accident for me, which he did.  Well, he

21   called and asked me a couple of questions

22   which I didn't have no knowledge of it, so

23   I told him to call Stephen.  I told him to

24   call Stephen.  And that, pretty much, it.

25   And I had worked the whole week and all

42b36050-e494-40fc-b446-c4ca426e2e0f

1   this stuff.  I really forgot about it

2   really, forgot about it really.

3   Q.    Okay.  So did you feel you were

4   covered by asking Jamie to key in the

5   accident before -- key in the report

6   before you left?

7   A.    We got 24 hours to key it in.  I

8   could have keyed it in myself.  When I got

9   there at 7:00 that night I could have

10  keyed it in myself, but I just wanted to

11  go ahead and get it keyed in anyway.  So,

12  no, it wasn't nothing like that.  We got

13  24 hours to key it in, so I could have

14  keyed it in when I got to work at 7:00

15  that night.

16  Q.    Did you follow-up and check with

17  Jamie to make sure the he keyed it in?

18  A.    Yeah.  He had keyed it in.

19  Q.    He told you that that night when you

20  came in?

21  A.    Well, I just looked.  You can go in

22  the system and see if it been keyed in or

23  not because they give you a number.

24  Q.    All right.  So you went into the

25  system afterwards and saw that the report

1   was in there?

2   A.    No.  I didn't go in the system.  I

3   just looked and see was it keyed.  I

4   didn't see it in the file and I didn't get

5   no notice saying I didn't key it in

6   because if you don't key it in in 24 hours

7   Janie, the District Manager, will get an

8   e-mail, or something, saying it ain't been

9   keyed in.

10  Q.    How do they know it hadn't been

11  keyed in?

12  A.    The, uh -- What you say now?

13  Q.    How would the system know that

14  there's been an accident if it's not put

15  in to be keyed in?

16  A.    That's a good question.  Unless the

17  customer call.  That's the only way

18  they'll know, if the customer called and

19  say "I had an accident" and you hadn't

20  keyed it in.

21  Q.    Right.  Okay.  So do you know if

22  that's what happened in this case?

23  A.    No.  No customer called at all.

24  Q.    You don't know that or you -- Do you

25  know --

1   A.    Did the customer call?  No.  I don't

2   know if the customer called.  I just know

3   that I asked Jamie to key it in and it was

4   keyed in.

5   Q.    Okay.  That's what I'm asking you.

6   How do you know that it was keyed in?

7   A.    Jamie told me.

8   Q.    Okay.  When you came back that

9   night?

10   A.    No, he wasn't there.  He wasn't

11   there.  I think I talked to him, like, the

12   next day when I came to work, or something

13   like that.  I asked did he key it in.

14   Q.    Okay.  And then, at that point, you

15   thought everything was fine?

16   A.    I thought everything was fine, yeah,

17   went on as normal, come to work every day

18   and doing what I usually do.

19   Q.    All right.  So what happened next

20   then?

21   A.    What happened next?  I know the next

22   day -- Not the next day, like, a week

23   later -- I won't say a week, that weekend.

24   It happened one weekend.  I just know that

25   Dalton come in, wanted to know what did I

42b36050-e494-40fc-b446-c4ca426e2e0f

1    do that night.  I couldn't recall what was

2    going on.  That's what I wrote on the

3    paper "I can't recall what I was doing."

4            And the next thing I know that

5    evening that I came to work, that same

6    night -- I came to work at 7:00.  That

7    morning I happened to look up and he was

8    in the office.  That's when he called me

9    in the office saying that I was going to

10   be terminated.

11   Q.    Okay.  Let me take you back a step.

12   He asked you to write a statement about

13   what had happened that night?

14   A.    Well, what was I doing that night,

15   uh-huh (affirmative response).

16   Q.    I mean, he specifically was asking

17   you about the Accident Report though?

18   A.    No, asked me what was I doing that

19   night to not to take the Accident Report.

20   And I had to write a statement, which I

21   did wrote a statement, that I can't recall

22   what I was working on, but I did ask

23   Stephen the Support Manager, to take the

24   accident.

25   Q.    And then you gave the statement to

1    Dalton.  And then --

2    A.    Dalton gave it to whoever, I

3    guess.

4    Q.    And how long after that did he come

5    tell you that you were being coached?

6    A.    That night.

7    Q.    So you gave him the statement that

8    morning and that night is when they told

9    you?

10   A.    Yes, sir.

11   Q.    All right.  I'm going to hand you

12   what I've marked as Exhibit Number 6, and

13   that's a handwritten statement signed by

14   you on April 10th, 2010.  Why don't you

15   just go ahead and read it.

16   A.    Okay.  "On 4-2-2010 customer had an

17   accident in the store by Pharmacy.

18   Associate called on the radio that a

19   customer had an accident in Pharmacy.  I

20   was working on something in the Manager

21   office and Stephen, Support Manager, was

22   in the office with me.  I asked him, at

23   that time, to go take care of that."

24   Q.    Okay.  Do you remember whether there

25   was anything else discussed with Dalton

42b36050-e494-40fc-b446-c4ca426e2e0f

 1   about what you should have done or what

 2   was wrong about what had happened,

 3   anything like that?

 4   A.    No, sir, not in the -- No, sir.

 5   Q.    How long did this meeting with

 6   Dalton, that morning, last when he asked

 7   you for the statement?

 8   A.    Well, he just asked for the

 9   statement.  That was it.  He was actually

10   scheduled off that day.  He just came in

11   and got that statement and left.

12   Q.    Did he explain to you that the

13   Accident Report hadn't been keyed into the

14   system?

15   A.    No, sir.  No, sir.

16   Q.    Nothing like that?

17   A.    Nothing like that.

18   Q.    All right.  Okay.  So then that

19   evening --

20   A.    I got to work at 7:00.  I was

21   scheduled to come to work at 7:00 that

22   evening.

23   Q.    All right.  Tell me what happened

24   then.

25   A.    Nothing.  Going on as usual.  He was

1    in the office with an hourly associate

2    doing something.  I know he called me

3    where I was sitting in the office.  And he

4    called me in his office.  And that's when

5    he broke down and said that I was being

6    terminated.

7    Q.    Now who else was there?

8    A.    Uh, had, uh, I think his name

9    Raheen.  I think that's his name.  He was

10   a Store Manager in training.

11   Q.    Say the name again.

12   A.    I think his name's Raheen.  I think

13   that's what they call him.

14   Q.    Raheen?

15   A.    Yeah.  I think his name Raheen.  He

16   was a Store Manager in training, at that

17   time, that was in that store.  He was a

18   Store Manager in training.

19   Q.    Okay.

20   A.    And had the Training Coordinator in

21   there, hourly associate, helping to fill

22   out the paperwork.

23   Q.    Who was that?

24   A.    I can't recall the name but I see a

25   face.

1   Q.    Could you describe them?

2   A.    She, kind of, a white lady, about my

3   height, medium build.  I want to say

4   Linda.

5   Q.    All right.  And, basically, what --

6   How long did that meeting last?

7   A.    No time.  Went on and did what he

8   had to do and that was it.

9   Q.    All right.  Did you explain to him

10  what you just told me, that you told Jamie

11  to enter the report into the system?

12  A.    No.  I didn't tell him that.  I

13  mean, he knew that.  He already knew that

14  I had, uh, Jamie to key it in.  He knew

15  that.

16  Q.    How did he know that?

17  A.    I guess because Jamie went and told

18  him, I guess.  I don't know how he knew

19  it.  I don't know how he knew it.  I know

20  he knew.

21  Q.    How do you know he knew?

22  A.    Because that's what he put on my

23  termination form.

24  Q.    Okay.  But there was no discussion.

25  A.    No.

1   Q.    He just handed you the termination

2   form?

3   A.    He just come in there and say this

4   the reason why we terminating you.

5   Q.    No explanation by him about what --

6   how the decision was made?

7   A.    No.

8   Q.    And nothing about you, about what

9   had happened.

10  A.    No.  How the decision was made,

11  nothing like that, no.  He didn't go into

12  detail why or nothing.

13  Q.    I'm going to hand you what I've

14  marked as Number 7, which is an Exit

15  Interview Form dated April 10th, 2010.

16  Under Manager's Comments it says "Percy

17  had an hourly associate take an accident

18  report.  He failed to have the accident

19  entered into the system and as a result

20  another manager had to follow up.  When

21  they called Percy at home he said he did

22  not have any information on the accident,

23  that he would have to call Stephen for

24  information."  Okay.  Is that referring to

25  Jamie --

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 80

1   A.    Yeah.

2   Q.    -- calling you at home --

3   A.    Yeah.

4   Q.    -- and asking you about it and you

5   said --

6   A.    Uh-huh (affirmative response).

7   Q.    All right.  Was this Exit Interview

8   given to you at the time of your

9   termination?

10  A.    Yes, sir.

11  Q.    All right.  Did you explain that

12  this wasn't accurate?

13  A.    To him?  No, sir.

14  Q.    Okay.  You just took the Exit

15  Interview and left?

16  A.    I just took it and left.  No, sir, I

17  just took it and left.

18  Q.    How come you didn't try to explain

19  what had happened?

20  A.    The guy is just somebody you just

21  couldn't talk to him.

22  Q.    Because you couldn't talk to Dalton.

23  A.    Right.

24  Q.    Because you had a bad relationship

25  with him.

1    A.    Yes, sir.

2    Q.    All right.  So what did you do?  Was

3    it -- At that point, did you know you were

4    going to Open Door your termination?  Did

5    you know what you were going to do, at

6    that point, when you just took the Exit

7    Interview and left?

8    A.    No, sir.  I didn't know what I was

9    going to do.

10   Q.    At some point, did you Open Door?

11   A.    Never Open Doored it.

12   Q.    All right.  Did you call anybody at

13   Wal-Mart to ---

14   A.    No, sir.  Didn't call no one.

15   Q.    Why not?

16   A.    I already had used two Open Door.

17   They didn't -- They failed to get with me

18   so I say "Why use it?"

19        (Recess in the deposition)

20   BY MR. BEISER:

21   Q.    So I think where we left off, Mr.

22   Shaw, was you received -- you were called

23   in, the meeting lasted just couple of

24   minutes.

25   A.    It didn't last that long.  I don't

Page 82

1    know how long, but it wasn't that long.

2    Q.    And you were given the Exit

3    Interview.  Were you given any other

4    paperwork at that point?

5    A.    Gave me that and another seperation

6    paper.

7    Q.    A Seperation Notice?

8    A.    Yeah.

9    Q.    Okay.  In addition to, like, all

10   your other final pay and all that usual --

11   A.    Uh-huh (affirmative response).

12   Q.    Okay.  I've marked as Exhibit Number

13   8 a copy of a Seperation Notice also dated

14   April 10th, 2010.  Is that the other paper

15   that you were given?

16   A.    Yes, sir.

17   Q.    All right.  And, again, that says

18   "Percy had an hourly associate take a

19   customer accident.  The accident was not

20   keyed in on his shift and was left for the

21   Assistant on the next shift to do.  When

22   the Assistant called Percy for information

23   he said he didn't know anything about it,

24   to call Stephen."  So, basically, the same

25   thing --

42b36050-e494-40fc-b446-c4ca426e2e0f

1    A.    Same thing.

2    Q.    -- the other one said.  Okay.  And

3    you said that you just took this and left.

4    You didn't try to explain what had

5    happened and you did not Open Door because

6    you had --

7    A.    I already used Open Door twice and

8    nobody said nothing to me, so it wasn't --

9    Q.    Did you say anything at all to

10   Dalton or --

11   A.    No, sir.

12   Q.    All right.  After you left, did you

13   contact anyone at Wal-Mart to talk about

14   your termination at all, to complain about

15   the termination or to take any steps to,

16   you know, appeal the decision?

17   A.    Only person that I -- I might talked

18   to a couple of co-workers that I worked

19   with, like they work in other stores, just

20   venting.  That's all.

21   Q.    Are you familiar with the policy

22   itself about reporting customer accidents

23   within 24 hours?

24   A.    Yes, sir.  You got to report it

25   within 24 hours.

1   Q.    All right.  Did you ever, after you

2   were terminated, try to find Jamie and

3   say, "Hey, this wasn't keyed in"?

4   A.    No, sir.

5   Q.    All right.  So you simply just --

6   A.    Yeah.

7   Q.    -- walked off.

8   A.    Yes, sir.

9   Q.    All right.  At what point did you

10  decide that you were going to take some

11  type of legal action relating to your

12  termination?

13  A.    After I thought about it, just

14  sitting down thinking, because I felt

15  there was more into it than that because

16  my heart told me that wasn't right,

17  because no one tried to talk to me.

18        Like, in the past, like other

19  managers, and stuff, if something wrong

20  the DM would talk to them and stuff like

21  that.  No one ever gave me that

22  opportunity, even say I want to talk to

23  you.

24        And that's when I kept thinking

25  there's more to this.  There's more to

42b36050-e494-40fc-b446-c4ca426e2e0f

1   this than what they say it is.  So I just

2   thought about, I think, a month or two

3   later.  That's when I decided to go talk

4   to an attorney; one, or two, or three.

5   Q.    One, or two, or three attorneys, or

6   one, or two, or three months?

7   A.    No.  One, or two, or three months.

8   That's when I decided to go talk to an

9   attorney.

10  Q.    And what was it that you -- You just

11  knew something wasn't right.  You didn't

12  know what it was.  You just figured I'm

13  going to talk to an attorney about this.

14  A.    Because I didn't -- Because I

15  didn't -- Because I know how others got

16  treated.  Now I didn't get treated that

17  way.  And I'm trying to figure out -- I

18  started thinking about, you know, what --

19  what could happen?  And I just kept

20  thinking and thinking something, what

21  could happen?  And I thought, and I just

22  kept thinking.  I said, um, it's odd.  And

23  I just went and talked to them.

24  Q.    Now when you say how others had been

25  treated what are you --

42b36050-e494-40fc-b446-c4ca426e2e0f

1  A.    It's like when you in a higher

2  position, like I was, before we stepped

3  down usually a DM or somebody would talk

4  to you before they make a final decision.

5  That's what I mean.

6  Q.    So you decided, all right, just no

7  one talked to me, just the way this was

8  done, I don't know exactly what, but

9  something's wrong.  So that's why you went

10  to an attorney.

11  A.    Yes, sir.

12  Q.    And who did you go to?

13  A.    I can't think of his name.

14  Q.    Is that Mr. Robert, John Paul

15  Robert?

16  A.    I think that's his name.  I think

17  that's his name.

18  Q.    All right.  And how did you find Mr.

19  Robert?

20  A.    Just looked in -- I called an

21  attorney.  Then an attorney rep -- I mean

22  referred me to him.

23  Q.    And you called an attorney in

24  Slidell or --

25  A.    No, in Baton Rouge.  Then they

Page 91

1    A.    Robert.

2    Q.    And at what point did you decide,

3    okay, this is the real reason for my

4    termination was what?  What did you decide

5    the real reason for your termination

6    was?

7    A.    The real reason why I was

8    terminated?  Because I gave a deposition

9    and I told the truth.

10   Q.    And that was in the Marie Gibson

11   case?

12   A.    Yes, sir.

13   Q.    And at what point did you figure out

14   that that was the reason you were

15   terminated?

16   A.    Probably, like -- I just kept

17   thinking about it.  Probably, like, a

18   month later it all started coming

19   together.

20   Q.    And what specifically are the facts

21   that you base that conclusion on, that you

22   were terminated because of what you said

23   in the Gibson deposition?

24   A.    I think just because things that

25   they asked me, did I say it.

Page 92

1  Q.    What in particular?  You said you

2  told the truth.  What particulars did you

3  say?

4  A.    Well, I know that I informed Mike

5  York that it wasn't right -- It was not a

6  right termination because she had an

7  accident.  It shouldn't be legal and I

8  didn't want to terminate her.

9  Q.    You said that in the deposition?

10  A.    I think I did.  I can't quote

11  exactly what I said, but I said something

12  like that in the deposition.  I can't say

13  exactly what I said.

14  Q.    As best you can remember, what is it

15  that you said in the deposition that would

16  have caused Wal-Mart to terminate you?

17  A.    That and, also, the reason --

18  Q.    When you say that I want to just

19  make sure we're clear, that you told Mike

20  York we shouldn't be terminating her for

21  having an accident.

22  A.    Right.

23  Q.    Okay.  And what else?

24  A.    And that -- Which I did because it's

25  my job.  I had to, regardless, so I did

1    terminate her.

2    Q.    All right.  You said the second

3    thing was?

4    A.    Again, I think when I gave my

5    deposition I called and asked Mike, you

6    know, why -- If they ask me why I

7    terminated her of course you gotta tell

8    them, and I'd just quote what he said, to

9    let her know that she was terminated

10   because we need to be consistent in the

11   region and the district and did not have

12   the proper paperwork on file.

13   Q.    So you called -- Now that wasn't

14   anything you said in your deposition.

15   A.    I think I did.

16   Q.    You said that you called Mike York

17   before the depo and --

18   A.    Yeah.  I called Mike York before I

19   got the deposition because I didn't know

20   what I was going for, you know, what kind

21   of questions they were gonna ask me.  I

22   said if they ask me a question why I

23   terminated her what should I tell them and

24   that's what he told me, we gotta be

25   consistent in the district or region and

1   for not having the proper paperwork on

2   file and that was it.

3   Q.    Was that different than what he had

4   told you at the time he told you to

5   terminate her?

6   A.    No.  I just let him know my opinion

7   on that one.  We didn't know that she was

8   going to sue until we got the letter.

9   That's when I picked up the phone and

10  called Mike to say hey.

11  Q.    And what I'm asking you is when you

12  found out your were going to be

13  deposed you called Mike York --

14  A.    What you mean deposed?

15  Q.    Your deposition taken.  I'm sorry.

16  A.    Oh, right.  Okay.

17  Q.    And you said "What should I tell

18  them?"  And he said "We have to be

19  consistent in the district and the region

20  if people have an accident and they don't

21  have their paperwork."

22  A.    Right.  Yes, sir.

23  Q.    All right.  Is that any different

24  than what he told you at the time he told

25  you to terminate her?

Page 95

1    A.    No, sir.

2    Q.    That's what he told you at the time.

3    A.    No.  He didn't say nothing like that

4    at the time because we didn't know we were

5    going to get sued, I guess.  I was just

6    telling him my opinion how I felt about

7    not terminating her, it wasn't right, and

8    it was illegal.

9    Q.    And that's what you told Mike at the

10   time you terminated Gibson?

11   A.    Yeah.  I told him -- No, not at the

12   time, before we were going to terminate

13   her.  I said if they come up with the

14   conclusion to terminate her I feel it's

15   not right to terminate Marie for having an

16   accident, and it's illegal if we do

17   terminate her.

18   Q.    And what did Mike say?

19   A.    Well, Mike said that his quote was,

20   "No.  That's the time we just should have

21   kept it in-house."  What I mean by

22   in-house, we shouldn't have said nothing

23   about it, but it's my job to report all

24   accidents anyway, so I gotta report it.

25   Q.    This is at the time right before you

1    were going to terminate Marie Gibson?

2    A.    Yeah, yeah.  That's when he said we

3    would have kept it in-house.

4    Q.    All right.  About how long before

5    your deposition was it that you called

6    Mike York to ask him --

7    A.    It was two or three times.  I don't

8    know.

9    Q.    It what?

10   A.    The deposition with a counsel like a

11   couple of times.  I really don't know.

12   Q.    Did you know he was getting his

13   deposition taken too?

14   A.    Who?  Mike?  No.  I didn't know he

15   was getting one.  I just thought I was the

16   only one.

17   Q.    When you talked to Mike before your

18   deposition do you remember anything else

19   you talked about?

20   A.    No, sir.

21   Q.    All right.  Was it a pretty short

22   conversation?

23   A.    Short.

24   Q.    A couple of minutes?

25   A.    Yeah, short.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.    All right.  And it was, basically,

2   just if they asked me why she was

3   terminated --

4   A.    What should I say?

5   Q.    All right.  Did you say that in the

6   deposition?

7   A.    Yes, sir.

8   Q.    All right.  And you were under oath

9   at that time?

10   A.    Yes, sir.

11   Q.    And what you said -- Like you are

12   right now.

13   A.    Yes, sir.

14   Q.    And what you said was the truth in

15   the deposition.

16   A.    Yeah.  What he told me to say.

17   Q.    Okay.  But that was the truth.

18   A.    It was the truth.

19   Q.    Because she had an accident and

20   didn't have the proper paperwork.

21   A.    Uh-huh (affirmative response).  And

22   we got to be consistent in the district or

23   region.

24   Q.    And being consistent meaning they

25   had fired other people for not having

1    their paperwork.

2    A.    That's what I assumed, but I never

3    known no one get fired, so.

4    Q.    But you wouldn't have any knowledge

5    about other people in the district or

6    region.

7    A.    No, sir.

8    Q.    Okay.  And you understand that if

9    they fired other people for not having

10   their paperwork when they have an accident

11   they need to be consistent and not fire

12   some --

13   A.    Right.

14   Q.    -- and not others; correct?

15   A.    Run that by me again.

16   Q.    If other people in the district have

17   an accident on the equipment and they're

18   not certified or licensed so they're fired

19   then do you understand that they need to

20   be consistent and treat everybody the

21   same?

22   A.    Exactly.  Oh, yeah.  What he say,

23   yes.  About what he quote to me, yes.

24   Q.    All right.  So you said that in the

25   deposition and that was the truth?

42b36050-e494-40fc-b446-c4ca426e2e0f

1   A.    Yes, sir.

2   Q.    And did you talk to Mike after the

3   deposition?

4   A.    No, sir.

5   Q.    All right.  Did you talk to anybody

6   at Wal-Mart after the deposition --

7   A.    No, sir.

8   Q.    -- about what you had said?

9   A.    No, sir.

10  Q.    All right.  Was anybody from

11  Wal-Mart in the deposition, sitting there

12  in the deposition, with you other than

13  Wal-Mart's Workers' Compensation lawyer?

14  A.    You talking about someone that work

15  for Wal-Mart?

16  Q.    Right.  Were there any Wal-Mart

17  people in there?

18  A.    No, sir.  It was just me and Marie

19  and -- It was on the phone when I gave a

20  deposition.  It was over the phone, so my

21  attorney wasn't in there.  Well,

22  Wal-Mart's attorney wasn't in there.  It

23  was a over the phone deposition.  That how

24  he call it.

25  Q.    Right.  Okay.  Marie Gibson's

1    lawyers were in the room with you, or

2    everybody was over the phone?

3    A.    No.  Marie's lawyer was in there.

4    Q.    All right.

5    A.    I assume those were her lawyers.

6    Q.    And then the Wal-Mart lawyer was

7    just over the phone --

8    A.    Other the phone.

9    Q.    -- and there were no Wal-Mart people

10   in --

11   A.    No, sir.

12   Q.    -- there.

13   A.    I was there by myself.

14   Q.    Okay.  And then after the deposition

15   you never talked to anyone at Wal-Mart

16   about what you had said.

17   A.    No, sir.

18   Q.    And did you even talk to the

19   Wal-Mart lawyer before the depo, before

20   the deposition?

21   A.    No, sir.

22   Q.    Okay.

23   A.    You talking like did he come in and

24   have a conversation with me?

25   Q.    Right.

42b36050-e494-40fc-b446-c4ca426e2e0f

1  A.    No, sir.

2  Q.    So he didn't tell you what to say

3  or --

4  A.    No, sir.

5  Q.    No one told you what to say.

6  A.    No, sir.  That's why I called

7  Mike.

8  Q.    All right.  Did you have any problem

9  with what Mike told you about the reason

10  from the termination?

11  A.    No.  I'm just talking about -- I had

12  a problem with it when --

13  Q.    When it happened.

14  A.    -- when it happened, but it was all

15  over with, so I didn't never thought

16  nothing of it until we got this.  That's

17  when I called him about what to say, you

18  know.

19  Q.    All right.  But when he said being

20  consistent --

21  A.    -- In the region or the district and

22  not having the proper paperwork on file.

23  Q.    So you don't have any reason to

24  believe he was lying to you.

25  A.    I'm just going by what he said

42b36050-e494-40fc-b446-c4ca426e2e0f

1    because I never heard of it.  I never

2    known -- Twenty-three years I been with

3    the company I never known no one had an

4    accident with a forklift without proper

5    paperwork getting fired.

6    Q.    All right.  Do you know of anybody

7    else having accidents with the forklift

8    and didn't have proper paperwork?

9    A.    I know when I worked in Cortana

10   there was a guy that had an accident,

11   almost killed the guy.  The two Associates

12   were playing on the forklift and they ran

13   into a trailer -- you know, we had those

14   storage trailers in the back -- and

15   almost killed the guy and they didn't

16   terminate them, so.

17   Q.    But do you know whether they didn't

18   have their certificate or didn't have the

19   license?

20   A.    They didn't even ask for it.

21   Q.    Okay.

22   A.    I was a Co-Manager in that store at

23   that time.

24   Q.    All right.  Were you involved with

25   the AP investigation, though, at that

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 104

1   Q.   What about other accidents involving

2   forklifts or equipment?  Are you aware of

3   any other accidents with a forklift?

4   A.   I can't recall any.

5   Q.   Okay.  So the only one you can

6   remember in all your time at Wal-Mart was

7   just that one in Cortana --

8   A.   Yes, sir.

9   Q.   -- where they were playing, but you

10  don't know whether the certificates or

11  licenses were ever -- that issue was ever

12  even raised.

13  A.   Yes, sir.

14  Q.   All right.  When were you in

15  Cortana?

16  A.   I can't remember.  It's on my Job

17  History.  I can't remember when I was in

18  Cortana.

19  Q.   All right.  April 2001 until about

20  August 2002, does that sound right?

21  A.   I guess, if that's what's on the

22  paper.

23  Q.   Okay.  Now do you know the date of

24  Marie Gibson's accident --

25  A.   No, sir.

Page 105

1   Q.      -- in Algiers?

2   A.      No, sir.

3   Q.      December 8th, 2008, is the date it

4   occurred.  Does that sound about right to

5   you?

6   A.      If that's what's on the paper.

7   Q.      All right.  How did you find out

8   about the accident?

9   A.      Well, I was at work when it

10  happened.

11  Q.      Did you go out there?  Were you out

12  there right after it happened?

13  A.      Yeah.  I went out there to look,

14  yes, when she reported it.

15  Q.      Okay.  Just take me through it real

16  quick.  Did she come report it to you?

17  Did somebody call you on the walkie?

18  A.      I can't recall exactly what

19  happened.  I just know she had an

20  accident.

21  Q.      Okay.  Do you know any details about

22  the accident?

23  A.      She -- I just know what she told me,

24  that the forklift went out of control and

25  she fell off.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.    Did you find out about the accident

2   from her or from someone else?

3   A.    Her, I think.

4   Q.    So she came to you and she said "I

5   just had an accident"?

6   A.    Let me go back.  I don't know if it

7   was her or one of the Associates came and

8   told me, but I knew, that same day, I knew

9   she had an accident and I know what she

10  told me.

11  Q.    And all she said was that she had

12  lost control of the forklift?

13  A.    It went out of control and she fell

14  off.

15  Q.    Now did you go out to the scene

16  where the accident happened?

17  A.    Yeah.  I went out there.

18  Q.    All right.  Was the forklift still

19  out there?

20  A.    Yes.

21  Q.    All right.  So, in other words, she

22  had had the accident, she fell off, and

23  then she came in and got you?

24  A.    I can't remember did she or someone,

25  but someone came and got me.

1   A.    Oh, yeah.  That a Associate had an

2   accident?  Yes.

3   Q.    Right.  Okay.  You did that.

4   A.    I can't remember I did or one of my

5   Co's.  I know he got the information from

6   the store.

7   Q.    All right.  I'm trying to figure out

8   what your involvement was in all of it.

9   You went out and saw it --

10  A.    Saw it, yeah, but I didn't key the

11  accident in though.

12  Q.    All right.  So the Co keyed it in,

13  you reported it, or the Co reported it, to

14  Loss Prevention.

15  A.    Uh-huh (affirmative response).

16  Q.    All right.  And then who from Loss

17  Prevention conducted the investigation?

18  A.    I don't know.  I assume it was Mike.

19  He's the District Manager, Loss

20  Prevention.  He's the highest one in that

21  market at that time, so I assume he did

22  everything he's suppose to do.

23  Q.    Okay.  And were you told anything

24  about what the investigation from Loss

25  Prevention showed?

42b36050-e494-40fc-b446-c4ca426e2e0f

1  A.    I was told that I need to try and

2  see how the proper paperwork to operate

3  the forklift, which I did, took those

4  steps.  She was working in, uh -- When I

5  talked to her she said she had the proper

6  paperwork and say had it in Boutte, the

7  store in Boutte, which I called, and they

8  said they couldn't find it.

9  Q.    All right.  So what did you do at

10 that point?

11 A.    That was it, termination.

12 Q.    Okay.  Did you have a discussion

13 with Mike York about the termination at

14 that point?

15 A.    Oh, no, sir.  With Mike York, after

16 I had that first conversation about that,

17 no, sir.

18 Q.    All right.  Well, I'm trying to get

19 the chronology down.

20 A.    Well, I had to get the final, yes.

21 You know, to terminate them, yes, and we

22 had that conversation, but, still we had

23 to terminate.  I mean, the final say so,

24 yes.  It was just termination, that was

25 it, no conversation or nothing like

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 110

1  that.

2  Q.   Okay.  I just want to go through the

3  timeline with you and make sure I got it.

4  A.   Okay.

5  Q.   She, or another Associate, comes in

6  and tells you she's had an accident --

7  A.   Right.

8  Q.   -- on the forklift.  You go out and

9  look at the forklift.

10  A.   Uh-huh (affirmative response)

11  Q.   It looks fine.

12  A.   Right.

13  Q.   Okay.  You tell Loss Prevention.

14  They do their investigation.

15  A.   No.  I just told Loss Prevention she

16  had an accident.  That's when like, I

17  think, a day or two, or something like

18  that.  I can't recall.  But, anyway, they

19  told me I need to find out did she have

20  all the paperwork on file.

21  Q.   All right.  Who told you that?

22  A.   Mike.

23  Q.   So he called you or he was there?

24  A.   I don't know if he was there or he

25  called me.

1    Q.    Okay.  So he called and said make

2    sure she has her paperwork.

3    A.    Well, I don't know if he called or

4    he was in the store, because he always in

5    the store.  He could have been in the

6    store.  He could have called.  I just know

7    I had to find out the store that she

8    transferred from did she have all the

9    paperwork on file.

10   Q.    And then you told somebody else to

11   see if she had her paperwork?

12   A.    I called myself on that.  I did the

13   research on that.

14   Q.    Okay.  You called the Boutte

15   store?

16   A.    Yes, sir.  I talked to the person in

17   Personnel, where they can pull her file,

18   to see did she have the proper paperwork

19   on file.  Well, pulled the file that they

20   keep all the documents in.

21   Q.    And do you remember who you talked

22   to?

23   A.    No, sir.

24   Q.    And what did they tell you?

25   A.    No, sir.

42b36050-e494-40fc-b446-c4ca426e2e0f

1   Q.    They said, no, they don't have it.

2   A.    They didn't have it.

3   Q.    Did they say we never had it or --

4   A.    They didn't say.  They just said it

5   wasn't in there.

6   Q.    Okay.  Not in her file.

7   A.    Yeah.  They didn't say she never had

8   it or no.  They just say it wasn't in

9   there.

10  Q.    Okay.  So when you found out that

11  Boutte didn't have it, and you didn't have

12  it at your store, what did you do next?

13  You told Mike York then?

14  A.    Yeah.  I let them know.

15  Q.    All right.  And then what happened

16  next?

17  A.    That's when he said it comes down to

18  say terminate her.

19  Q.    At that conversation, or he called

20  you back later to say --

21  A.    Later.  It was later.

22  Q.    All right.  Now when he called you

23  back later to say terminate her was there

24  anything -- was there any other

25  discussion?  In other words, did he tell

1    you to tell her the reason for her

2    termination?

3    A.    For not having proper paperwork on

4    file.  That's the reason I terminated

5    her.

6    Q.    All right.  And that was -- That

7    was, in fact, the case, but you felt that

8    since nobody else had been terminated for

9    that she shouldn't be terminated?

10   A.    Yeah.  I feel that she shouldn't be

11   terminated.  I did not want to terminate

12   her.

13   Q.    Okay.  Now this conversation that

14   you had, if I'm understanding you

15   correctly, you had, like, two or three

16   conversations with Mike York.  The first

17   was where he said see if she has her

18   paperwork.

19   A.    No.  That wasn't the first one.  The

20   first one when she first had the accident

21   and we were thinking about what could

22   happen.  That's when I let them know.

23   They said terminate because she had an

24   accident.  It's illegal, and it ain't

25   right, and I didn't want to do it.  That's

42b36050-e494-40fc-b446-c4ca426e2e0f

1    the first conversation.

2    Q.    Before Mike York ever said to

3    terminate?

4    A.    Yeah.  That's the first

5    conversation.

6    Q.    Okay.  Take me back then.  Tell me

7    about this first conversation.

8    A.    The first conversation I had with

9    Mike was when she had the accident and he

10   was in the store at the time.  We was

11   talking.

12   Q.    So he was there when she had the

13   accident?

14   A.    No.  He wasn't there.  He wasn't

15   there when she had the accident.

16   Q.    Okay.

17   A.    He probably been the next day or

18   two, because they always visit our store,

19   and we just happened to start talking

20   about it, and when stuff is in the

21   process.  That's when I let him know my

22   opinion that it ain't going to be right to

23   terminate Marie if she had an accident

24   because the paperwork and stuff wasn't on

25   file because, in my heart, to me, if

1    someone work for you it's illegal to

2    terminate somebody if they have an

3    accident on the job.  That's how I felt.

4    Q.    Okay.  I want to back up a second,

5    and we'll get to that in a minute, --

6    A.    Okay.

7    Q.    -- but you talked about two or three

8    conversations you had with Mike York.

9    A.    Uh-huh (affirmative response).

10   Q.    One of them he said see if she has

11   her paperwork, and then you found out she

12   didn't have her paperwork, and then you

13   talked to him again and he said terminate

14   her.

15   A.    Okay.

16   Q.    Now you said you had another

17   conversation with Mike, before either of

18   those, when you first reported the

19   accident.

20   A.    That's when we were talking about

21   it's a possibility she can get terminated.

22   Q.    How did you -- I want you to try to

23   remember, as best you can, what you talked

24   about with Mike York when you first

25   reported her accident.

42b36050-e494-40fc-b446-c4ca426e2e0f

1    A.    All I can report is when he was in

2    the store when I was talking to him.  We

3    was talking about the possibility that she

4    could be terminated.  That's when I let

5    him know how I felt and that's something I

6    didn't want to do.

7    Q.    But did you talk about the paperwork

8    first?

9    A.    No.  We didn't talk about the

10   paperwork first.  We talked about that

11   later, like a day or two, when he wanted

12   to see did she have her paperwork on

13   file.

14   Q.    Okay.  So the paperwork wasn't even

15   discussed at that point.

16   A.    No, wasn't even discussed.

17   Q.    You just said Marie had an accident.

18   A.    Uh-huh (affirmative response)

19   Q.    All right.  And then take me

20   through -- Tell me -- It's important that

21   you tell me what you can remember about

22   that conversation.

23   A.    This what I remember, that we were

24   talking that Marie had an accident, and we

25   were just throwing up stuff up in the air,

1   you know, like her possibly getting

2   terminated or whatever.

3   Q.    How did that come up?

4   A.    We just talking in general, just

5   talking in general.  And that's when I let

6   him know how I feel -- how I felt -- about

7   if it come to the conclusion that she

8   going to be terminated for what cause, and

9   I let him know how I felt.

10          I said, Number One, it ain't

11  going to be right, it's illegal, and I

12  don't want to do it.  I feel it's not

13  right if I have to do it, put it like

14  that.  And then he said, at that time, we

15  should have just kept it in-house.

16  Q.    How did the topic of termination

17  come up though?

18  A.    Oh, once they called and said to see

19  did she have all of the --

20  Q.    Sorry.  Sorry to interrupt, but I'm

21  just trying to -- Because you're -- This

22  is all happening in the first

23  conversation.  I want you to focus on that

24  first conversation that you had with Mike

25  York; okay?

1   A.    Okay.

2   Q.    Marie had an accident.

3   A.    Right.

4   Q.    And you're talking to him back and

5   forth and you said -- that's when he said,

6   or somehow it came up, well, she could get

7   terminated because of this.

8   A.    Uh-huh (affirmative response).

9   Q.    Is that right?

10  A.    No.  We didn't know that she was

11  going to get terminated.  We were just

12  talking in general.

13  Q.    I understand you didn't know at that

14  point.  You're just talking in general --

15  A.    Right.

16  Q.    -- and you said you gave him your

17  opinion --

18  A.    Right.

19  Q.    -- that I don't think she should get

20  terminated because she's had an accident.

21  A.    Right.  That she had an accident for

22  Wal-Mart, yes, sir.

23  Q.    "I don't believe that anybody should

24  get terminated for having an accident."

25  A.    Right.  "And it's illegal, if you do

1    terminate her, for having an accident."

2    Q.    All right.  Now that was before any

3    of this stuff came up about her paperwork

4    or anything.

5    A.    Right.  Right.

6    Q.    So you just said, "Mike", you know,

7    "she shouldn't get terminated for having

8    an accident.  I don't believe" -- This is

9    just talking in general terms.

10   A.    Yeah, talking in general.

11   Q.    Okay.  Now what was illegal about

12   it?  Was that just what you felt?  You

13   felt it wasn't right or you felt it wasn't

14   legal?

15   A.    Well, I felt it's not right because

16   she on the clock working for Wal-Mart.

17   She doing work for Wal-Mart.  She wasn't

18   out there horseplaying around or nothing

19   like that.  She was just out there -- She

20   out there doing her job like she suppose

21   to be doing and she just had a freak

22   accident.

23   Q.    But that was your feeling about it.

24   You felt it's not right if somebody's

25   working for us and has an accident --

Page 120

1  A.    And I feel that it's illegal if they

2  terminate someone for having an

3  accident.

4  Q.    And, based on what you would say,

5  it's illegal?  Would you say it's against

6  some law or it's just in your opinion that

7  it's not right?

8  A.    It's not right.

9  Q.    Okay.  You weren't making the

10  statement about whether it's legal or not,

11  or whether some law is being violated.

12  A.    Well, in my opinion -- Well, what I

13  was thinking that it should have been

14  against the law to terminate someone to

15  get terminated for having an accident on

16  the workplace if they not horseplaying

17  around, if they not horseplaying around.

18  Q.    If it's not their fault.

19  A.    Yeah, if it's not their fault.

20  Q.    And, again, this is just talking

21  before, you know, whether there's an

22  investigation, you know, whether it's her

23  fault or not, before whether you know

24  anything about the paperwork; correct?

25  A.    Correct.

Page 121

1  Q.    All right.  And did you say to Mike

2  "I don't think it's right"?  It's

3  important that you remember what you said

4  to him.  Did you say "I don't think it's

5  right that Marie should", you know, "if it

6  comes down to that Marie shouldn't be

7  terminated for having an accident while

8  she's working for us"?

9  A.    That's so long ago what we talked

10 about.  I can't quote exact what I said,

11 but I know I did let him know that it

12 wasn't right to terminate her, if it comes

13 down to that, for them to --

14 Q.    If it comes down to it; right?

15 A.    Uh-huh (affirmative response).

16 Q.    And, again, that was based on your

17 opinion about what's right, what's morally

18 right.

19 A.    It should be illegal.

20 Q.    It should be illegal, but you don't

21 know that it's illegal.

22 A.    I don't know if it's illegal or not,

23 but it should be illegal.

24 Q.    Okay.  And, again, your basis is it

25 should be illegal because if they're

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 122

1    working for you, on the clock for you and

2    they're doing work, and it's not their

3    fault they shouldn't be fired.

4    A.    To me.  That's right.

5    Q.    All right.  So that's the first

6    conversation you had with Mike.  How long

7    was that conversation?

8    A.    About no more than about five --

9    about five or ten minutes in the store

10   walking, talking.

11   Q.    Okay.  And that was in the store.

12   A.    Yeah.

13   Q.    Okay.  Then -- And that was the day

14   of the accident or the day after?

15   A.    I can't remember what day it was.

16   Q.    All right.  And then Mike calls you,

17   or maybe in person, says --

18   A.    Yeah.  Someone called me and say we

19   need to find out do she have the proper

20   paperwork on file.

21   Q.    You don't know if that was Mike or

22   not that did that?

23   A.    I can't remember.  I can't remember

24   who it was, Mike -- It was someone in the

25   Market Office --

1   Q.    All right.

2   A.    -- saying make sure.  Call and see

3   if she's got the proper paperwork on file.

4   And that's when I called Marie and asked

5   her did she have the proper paperwork on

6   file, and she told me yes, and she told me

7   where it should be.  That's when I called

8   Boutte.

9   Q.    All right.

10  A.    That's the store she transferred

11  from.

12  Q.    And you don't remember if it was

13  York or somebody else.

14  A.    No.

15  Q.    Just someone calling.

16  A.    Yeah.

17  Q.    And, at that point, you had never

18  checked for it because you had never been

19  involved --

20  A.    Right.

21  Q.    -- with a forklift accident other

22  than ten years, or seven years, earlier in

23  Cortana.

24  A.    Yes, sir.

25  Q.    All right.  And then you checked,

42b36050-e494-40fc-b446-c4ca426e2e0f

1   saw that there was no paperwork, and then

2   you called Mike and said there's no

3   paperwork.

4   A.    Yeah, I checked.  They told me there

5   wasn't no paperwork.  That's when I called

6   him and told him there wasn't no

7   paperwork.

8   Q.    All right.  And do you remember

9   anything else about that conversation?

10  A.    No, sir.

11  Q.    All right.  Then later that day, or

12  the next day, whatever it was, because I

13  think she was terminated two days after

14  the accident.

15  A.    I know she wasn't terminated that

16  day.  I know she got terminated a couple

17  of days, or something like that, after the

18  accident.  I called and then they say

19  terminate her.

20  Q.    Okay.  Now, when you say they, who

21  is that that you called and you talked

22  to?

23  A.    Either Mike or -- Either Mike or

24  Roland, the HR person, one of them.

25  Q.    Okay.  And, at that point, it was

Page 125

1    either Mike or Roland, you don't know,

2    called and said terminate her.  What did

3    they tell you in terms of why she had to

4    be terminated?

5    A.    For not having the proper, uh, work

6    -- Not having the proper stuff on file to

7    operate the forklift.

8    Q.    Did you say anything to whoever it

9    was that you talked to about, well, you

10   shouldn't do this or --

11   A.    No, sir.

12   Q.    Nothing.

13   A.    No, sir.

14   Q.    So you then terminated Marie Gibson

15   for the reasons that whoever it was that

16   called down and told you.

17   A.    Yes, sir.

18   Q.    All right.  And did you fill out her

19   termination paperwork or did someone

20   else?

21   A.    I think Bill did.  Bill was in there

22   with me.

23   Q.    Your Co-Manager, Bill Rapco?

24   A.    Yeah.  I think he was in there with

25   me.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 126

1    Q.    Now, at this point, there had been

2    an investigation.  You don't know what LP

3    found in terms of --

4    A.    No, sir.

5    Q.     -- anything being wrong with the

6    forklift or anything --

7    A.    No, sir.

8    Q.     -- any of the details about the

9    investigation.

10   A.    No, sir.

11   Q.    All right.  And did you still feel

12   that, based on the fact that she was

13   operating this equipment and didn't have

14   the license and certificate, that it was

15   still wrong to terminate her?

16   A.    Yes, sir.

17   Q.    Okay.  And what was your reason for

18   that, just because you hadn't seen that

19   before?

20   A.    No, no.  I had never seen it before

21   and, plus, we also take a CBL, Computer

22   Based Learning, in how to operate the

23   forklift, and all of that, and everybody

24   got to pass it, and she did take that and

25   passed it.  She just didn't have that one

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 127

1   paper on file.

2   Q.    All right.  Now you don't get your

3   certificate to operate a forklift from

4   taking a CBL; isn't that right?

5   A.    Right.  Someone got to certify

6   you.

7   Q.    Okay.  And to get certified you have

8   to take a written test and a driving test;

9   is that right?

10  A.    I don't know about a written test.

11  Someone just be on the forklift, they tell

12  you certain things to do, and they check

13  it off.

14  Q.    Okay.  But you have to go and take

15  an actual test in order to get a

16  certificate.

17  A.    Yeah.  You got to take the test

18  first.  And then to get your certificate

19  that's when someone got to watch you on a

20  forklift and tell you back up, whatever,

21  on the paper, and they check it off, and

22  then you certified.

23  Q.    Okay.  Because there's two different

24  things with heavy equipment, there's a

25  certificate and a license; is that

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 128

```
 1   right?

 2   A.    Uh-huh (affirmative response).

 3   Q.    Yes?

 4   A.    Yes, sir.

 5   Q.    Okay.  And the certificate and the

 6   license are --

 7   A.    Yeah.

 8   Q.    You get a badge?

 9   A.    Yeah.  You get your badge once you

10   get certified, --

11   Q.    Okay.

12   A.    -- the certificate.  That's when

13   they sign off on your badge and you wear

14   it on your name badge showing that you

15   qualified to operate a forklift.

16   Q.    All right.  And, again, you take,

17   like, a driving test.

18   A.    Yes, sir.

19   Q.    A Wal-Mart driving test basically.

20   A.    Yes, sir.

21   Q.    And they check off the list.

22   A.    Right.

23   Q.    And then that's your certificate

24   that goes in the file?

25   A.    Yes, sir.  They come out and check
```

42b36050-e494-40fc-b446-c4ca426e2e0f

1    it.  They check everything off.  That'll

2    go in a file.

3    Q.    All right.  And you had to do that

4    yourself.  Did you have to do that

5    yourself?

6    A.    I did one after -- I never did one

7    until -- until, uh -- Only thing I did was

8    the CBL, but I never did a certificate,

9    like someone watch me drive and check it

10   off, for the 23 years I worked for

11   Wal-Mart, until Marie had the accident.

12   Q.    Okay.  Now everybody takes CBLs at

13   Wal-mart, right, computer based

14   learning?

15   A.    Yeah.  Uh-huh (affirmative

16   response).

17   Q.    And you would take CBLs on equipment

18   even if you don't work with the equipment;

19   is that right?

20   A.    Right.

21   Q.    A cashier would take it.

22   A.    Yes, sir.

23   Q.    Okay.

24   A.    No.  It depends on what you

25   classified as determine if you take it or

1    not.  It depends on what you classified as

2    determines if you take the CBL or not.

3    Q.    Okay.  But you would take a CBL on

4    heavy equipment CBL even if you were not

5    operating the equipment; is that right?

6    A.    Talking about me?

7    Q.    I'm talking about, you know,

8    Associates.  You didn't operate -- Did you

9    operate the forklift?

10   A.    Yes, sir.

11   Q.    Okay.

12   A.    Always on it.

13   Q.    All right.  But other people who

14   would take the CBL wouldn't necessarily be

15   operating the forklifts; is that right?

16   A.    They can take the CBL if -- They can

17   take the CBL and pass the CBL, but if they

18   want to operate the forklift they gotta

19   get certified.

20   Q.    Right.  What I'm saying is just the

21   fact that you take a CBL on a forklift

22   didn't mean anything.

23   A.    No, sir.

24   Q.    Right.  What you have to do is take

25   this written test, and this driving test,

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 131

1    and get your certificate, and get a badge.

2    A.    It's not -- Well, it's a test that

3    they go over it.  I don't think they got

4    to write anything down.

5    Q.    Okay.

6    A.    You know, it just a test they go

7    over.  Once they certified then they give

8    them a badge to wear.

9    Q.    All right.  And then when you're

10   riding on a forklift you need to have a

11   badge showing that you can operate the

12   forklift.

13   A.    Yes, sir.

14   Q.    All right.  And do you understand

15   the reason for that?

16   A.    Safety reasons.

17   Q.    Okay.  To make sure that everybody

18   who's riding this equipment, where you

19   could get hurt, had been properly trained

20   on it; is that right?

21   A.    Yes, sir.

22   Q.    Okay.  And before Marie Gibson's

23   accident this had never come up at the

24   store.

25   A.    No, sir.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 132

1  Q.    Because there had never been an

2  accident.

3  A.    No.  There's never been an accident,

4  no, sir.

5  Q.    All right.  I've marked as Exhibit

6  Number 10 an Exit Interview for Marie

7  Gibson.  Have you seen that before?

8  A.    Yes, sir.  I signed it.

9  Q.    Excuse me?

10  A.    Yes, sir.  I signed it.

11  Q.    That's your signature at the

12  bottom?

13  A.    And that's Bill's signature up

14  there.

15  Q.    Okay.  Bill Rapco?

16  A.    Yeah.

17  Q.    All right.  Who filled that out?

18  Whose handwriting is that?

19  A.    Bill.

20  Q.    Okay.  It says "Reason For

21  Termination:  Creating an unsafe work

22  environment by operating a piece of heavy

23  equipment without being licensed and

24  having the proper documentation on file

25  resulting in an accident."  Okay.  And

42b36050-e494-40fc-b446-c4ca426e2e0f

1    that was your understanding of the reason

2    why Marie was being terminated; correct?

3    A.    Yes, sir.

4    Q.    All right.  And that's also what you

5    testified about in her deposition.

6    A.    Yes, sir.

7    Q.    In her Workers' Comp case; right?

8    A.    Yes, sir.

9    Q.    That she was terminated because she

10   had an accident and didn't have the proper

11   documentation on file to operate the

12   equipment.

13   A.    Yes, sir.

14   Q.    All right.  And, other than the

15   discussion that you had with Mike York

16   when you first reported the accident, like

17   "I don't think she should be" --

18   A.    Yes, sir.

19   Q.    -- "terminated because she has an

20   accident on the clock working for us",

21   that's the only discussion that you had

22   with anybody about your feelings about the

23   correctness of Marie Gibson's termination.

24   A.    Yes, sir.

25   Q.    Okay.  Now when you gave Ms. Gibson

1   this Exit Interview and terminated her did

2   you believe that the termination was

3   illegal, against the law, --

4   A.    Yes, sir, I did.

5   Q.    -- or did you believe that it was

6   just wrong?

7   A.    I feel -- I thought both.  I thought

8   it was against the law and it was wrong,

9   but I did it because I'm the Store

10  Manager.  That's the direction they gave

11  me, so I followed through with it.

12  Q.    Now what I want to understand here,

13  though, is what law was this against?  Was

14  it --

15  A.    I -- I hadn't seen no law.  That's

16  just my opinion, what I was thinking, that

17  it should be a law to terminate someone --

18  Q.    That it should be.

19  A.    That when you work for this company,

20  you had an accident, they going to

21  terminate you because you had an

22  accident.

23  Q.    And, again, that was your opinion

24  about the rightness or wrongness of the

25  termination.

1  A.    And I let him know that.

2  Q.    You let who know that?

3  A.    Mike.  That it's not right and I

4  ain't want to terminate her for having an

5  accident.

6  Q.    That's back in the first discussion

7  you had --

8  A.    Uh-huh (affirmative response).

9  Right.

10  Q.    -- A couple of days earlier.

11  A.    Right.

12  Q.    Okay.  Did you have any other

13  discussion with Mike after that --

14  A.    No, sir.

15  Q.    -- about the rightness or wrongness

16  of the termination?

17  A.    No, sir.

18  Q.    Okay.  Just that first time you

19  reported it.

20  A.    Yes, sir.

21  Q.    Did you talk to anyone else, or

22  complain to anyone, at Wal-Mart about the

23  rightness or wrongness of the

24  termination?

25  A.    No, sir.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 137

1    knew, she wasn't seriously hurt?

2    A.    She hurt her wrist.

3    Q.    But hurt her wrist but was able to

4    come right back to work.

5    A.    As far as I know, yes, sir.

6    Q.    Yeah.  And you never had any

7    discussion with Mike York, or anybody

8    else, about Marie's going to have a

9    Workers' Comp claim, or she's going to

10   miss work or have medical bills.  You

11   never had any discussion like that with

12   anybody.

13   A.    No, sir.

14   Q.    Now when you told Marie about her

15   termination how long did that meeting

16   last?

17   A.    It didn't last long.

18   Q.    All right.  Was there any discussion

19   with her about this is wrong or anything

20   like that?

21   A.    No.  I did tell her that if she

22   don't agree with it she can use the Open

23   Door.

24   Q.    And do you know whether she used the

25   Open Door?

 1  A.    No, sir.  I don't know.

 2  Q.    Okay.  No one ever talked to you

 3  about it afterwards?

 4  A.    No, sir.

 5  Q.    Okay.  Now other Associates at the

 6  store, that you're aware of, that had

 7  accidents, did you ever terminate any of

 8  those Associates for having an accident?

 9  A.    No, sir.

10  Q.    And you knew that would be wrong.

11  A.    Oh, yeah.

12  Q.    Okay.  And you had never done that

13  and were never told by anybody to do it.

14  No one ever told you fire --

15  A.    Oh, no.  No.

16  Q.    -- this Associate for having an

17  accident.

18  A.    Oh, no.  No one ever told me.

19  Q.    All right.  Now, if someone had told

20  you to do that would you have fired

21  somebody knowing that it was wrong?

22  A.    I would have said the same thing I

23  said to him, but because I'm in management

24  and they higher up than me, I still had to

25  follow through on it.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 139

1  Q.    Okay.  So you would have followed

2  through even if you felt it was wrong?

3  A.    Right, because they my supervisor.

4  Q.    Would you have done it even if you

5  thought it was illegal to do?

6  A.    Yes, sir, because I have to pay my

7  bills.

8  Q.    Now are you aware that the seatbelt

9  on the forklift was broken?

10  A.    No, sir.

11  Q.    You never knew that it was broken?

12  A.    Until that day she had the accident

13  where we went there and looked at it.

14  Q.    Okay.  Was it rusted?

15  A.    I can't recall.  I just know it

16  wasn't working.

17  Q.    Because she claims that it had been

18  broken for a long time.

19  A.    It probably have.  I never looked at

20  it.  I never inspect it.  I never inspect

21  the forklift, so I personally can't say it

22  was.  The only time I inspected it is when

23  she had that accident.

24  Q.    All right.  And before you get on a

25  forklift you're suppose to check it and

1   make sure everything is operable and

2   working correctly?

3   A.    They have a check log.  Someone

4   suppose to check it.

5   Q.    All right.  So, if the seat belt's

6   broken you're suppose to report that and

7   get it fixed before you operate it.

8   A.    Yes, sir.

9   Q.    So, if it had been broken before the

10  accident then whoever was operating it

11  should have reported the seat belt.

12  A.    Right.  If they would have reported

13  it, we would have called and get it

14  fixed.

15  Q.    Now, if she claims that she reported

16  it, that the seat belt was broken, to you

17  and you refused to fix it and told her

18  that wasn't necessary --

19  A.    I wouldn't do that.

20  Q.    All right.  Now you're suppose to

21  have a couple of spotters with you when

22  you're --

23  A.    One in the front and one in the

24  back.

25  Q.    Do you know whether she had

1    spotters?

2    A.    No, sir.

3    Q.    Okay.  You're suppose to have a

4    safety vest on?

5    A.    Orange vest, yeah.

6    Q.    Do you know whether she had a safety

7    vest on?

8    A.    I don't know if she had one on or

9    not.  I can't answer that one.

10    Q.    Okay.  Now, if she had operated the

11    forklift knowing that the belt was broken,

12    didn't have spotters, didn't have a safety

13    belt, and didn't have certification, those

14    would all be safety violations, wouldn't

15    they?

16    A.    Yes, sir.

17    Q.    All right.  But it's your opinion

18    that even with all those safety

19    violations, assuming that all those --

20    that all that was the case, that there

21    were no spotters, no vests, no

22    certification, all that, in your opinion,

23    even though those were safety violations,

24    she still should not have been terminated;

25    correct?

1    A.    Correct.

2    Q.    All right.  Now, as far as you know,

3    Mike York never took any type of action

4    against you when you told him that, in my

5    opinion, you know, Marie, if it comes down

6    to it, shouldn't get terminated out of

7    this.

8    A.    No, sir.

9    Q.    Okay.  Now did you ever talk to

10   Ms. Gibson after her termination?  Have

11   you ever spoken to her?

12   A.    No, sir.

13   Q.    And you never went to anyone outside

14   of Wal-Mart, at any point, after Marie

15   Gibson was terminated to complain that

16   there was something illegal about her

17   termination, did you?

18   A.    No, sir.

19   Q.    And that was not just while you were

20   working there, but I'm talking about after

21   you worked there as well.

22   A.    Repeat that again.

23   Q.    Yeah.  I mean, you never -- Other

24   than the conversation that you had with

25   Mike York, you know, I don't think --

Page 143

1    A.    Okay.

2    Q.    -- she should get fired, when you

3    first reported it, you never had any other

4    conversations with anybody, either at

5    Wal-Mart or outside of Wal-Mart, that work

6    for any other agency, a government agency,

7    anything else, relating to Marie Gibson's

8    termination, that you thought Marie

9    Gibson's termination was wrong.

10   A.    Talking about government agencies

11   and stuff?  No.  Like government agents

12   and stuff, no, sir.

13   Q.    Or anybody else outside of Wal-Mart.

14   I mean, you didn't complain to a

15   government agency, but anybody else?

16   A.    Besides -- Well, when I talked to a

17   lawyer.  That's about it.  Other than

18   that, no, sir.

19   Q.    Okay.  Are you aware of anybody else

20   at Wal-Mart ever being terminated for

21   having an accident?

22   A.    No, sir.

23   Q.    How about for having an injury --

24   A.    No, sir.

25   Q.    -- at work?  As far as you know,

42b36050-e494-40fc-b446-c4ca426e2e0f

1    A.    Oh, no, sir, besides this

2    accident.

3    Q.    That's the only one.

4    A.    That's the only one.

5    Q.    Now is it your testimony that you

6    believe you were fired because of what you

7    said in the Workers' Comp deposition --

8    A.    Yes, sir.

9    Q.    -- of Marie Gibson, not because of

10   what you said to Mike York at the time

11   that you first reported it.

12   A.    Because of my deposition.

13   Q.    Because of your deposition, okay.

14   And you read your deposition, you said,

15   before your deposition today?

16   A.    Oh, no.  I ain't even looked at it,

17   no, sir.

18   Q.    When was the last time you looked at

19   it?

20   A.    Been a while.  It been over a

21   month.

22   Q.    Over a month?

23   A.    Yeah.

24   Q.    I'll show you a copy of your lawsuit

25   that we've marked as Exhibit Number 11.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 146

1    You looked that over before it was filed,

2    is that right, Mr. Shaw?

3          MS. McGEHEE:  I'm sorry.  The

4    question was you looked that over before

5    your deposition?  Is that what you said?

6          MR. BEISER:  No.  I said "You

7    looked that over before it was filed?"

8    BY MR. BEISER:

9    Q.    You read that before it was filed to

10   make sure that it was accurate, that all

11   the allegations on the petition are

12   accurate?

13         (Witness reviewing petition)

14   A.    Yes, sir.

15   Q.    All right.  You read it over and

16   everything on there is accurate?

17   A.    Yes, sir.

18   Q.    And did you look at your lawsuit

19   before you came here today?

20   A.    No, sir.

21   Q.    All right.  If you go to the second

22   page, Paragraph Number 6, where it says

23   Specific Facts.  It says, "On March 10th,

24   2002, Mr. Shaw gave deposition testimony

25   wherein he testified that a former

Page 147

1    employee of Wal-Mart, Marie Gibson, was

2    terminated for having an accident."

3           Now it's your testimony that you

4    testified in that deposition that she was

5    terminated because she had an accident and

6    did not have proper certification to

7    operate heavy equipment; is that right?

8    A.    Correct.

9    Q.    Okay.  You didn't testify in there

10   that she was just terminated for having an

11   accident; is that right?

12   A.    Right.

13   Q.    Okay.  Now Paragraph 8 says "Mr.

14   Shaw testified that the company, Wal-Mart,

15   attempted through the direction of Mr.

16   Mike York to terminate Ms. Gibson for a

17   technical violation of Wal-Mart policy."

18   All right.  Now what is the technical

19   violation of Wal-Mart policy that you're

20   referring to?

21   A.    That she didn't have the proper

22   paperwork on file.

23   Q.    Right.  Did you testify in the

24   deposition that Mr. York told you to

25   terminate Ms. Gibson for a technical

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 148

1    violation of Wal-Mart policy?  Do you

2    remember if you testified about that?

3    A.    I can't recall.

4    Q.    Okay.  You don't remember if you

5    gave any kind of opinion at all about

6    whether there was a technical violation or

7    anything?

8    A.    I can't recall.

9    Q.    Okay.  Now Paragraph 9 says "Mr.

10   Shaw informed Wal-Mart that the

11   termination of Ms. Gibson was

12   illegal/inappropriate at the time of her

13   termination."  Okay.  Now, in fact, what

14   you did was tell --

15   A.    Mike.

16   Q.    -- Mike York before, two days

17   before, before any of the --

18   A.    Right.

19   Q.    -- paperwork issues came up --

20   A.    Uh-huh (affirmative response)

21   Q.    -- that it was your opinion that

22   it's not right.

23   A.    Yeah.  I informed Mike it was

24   illegal, Mike York.

25   Q.    Did you say it was illegal or did

Page 149

1   you say I don't think it's right to --

2   A.    It's not right and it's illegal.

3   Q.    Or it should be illegal.

4   A.    Yeah, it should be illegal.

5   Q.    So it wasn't at the time of

6   termination, it was before.  It was, as

7   you testified, it was that first

8   conversation.

9   A.    Yeah, that first conversation, like,

10  a couple of days before we terminated her,

11  right during that time frame.

12  Q.    Okay.  And, again, this allegation

13  here in Paragraph 9, that is referring to

14  what you've previously testified about,

15  that one conversation you had with Mike

16  York; correct?

17  A.    Yes, sir, that one conversation.

18  Q.    Right, when you first reported the

19  accident.

20  A.    Yes, sir.

21  Q.    Okay.  Paragraph 10, it says

22  "Mr. Shaw testified that the reason for

23  termination was the filing of a Workers'

24  Compensation claim."  Now, did you testify

25  in the Marie Gibson deposition that the

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 150

1   reason for her termination was the filing

2   of a Workers' Compensation claim?

3   A.    I don't know.  I'd have to look.  I

4   don't know.

5   Q.    Okay.  So, basically, whatever it

6   says -- You don't remember.

7   A.    I don't remember.

8   Q.    You don't remember testifying about

9   that.

10  A.    I don't remember.  I have to look

11  over it.

12  Q.    Okay.  Can you remember ever telling

13  anybody that you believed Marie Gibson was

14  terminated for filing a Workers'

15  Compensation claim?

16        MS. McGEHEE:  I object to the

17  form of the question.  That includes

18  attorney/privilege information.  You don't

19  to have answer that.

20  BY MR. BEISER:

21  Q.    Other than your attorney, did you

22  ever tell anyone at Wal-Mart that you

23  believed that Ms. Gibson was fired for

24  having a Workers' Compensation claim?

25  A.    I can't recall.

Page 151

1   Q.    Okay.  And your deposition

2   transcript, whatever you said in there,

3   that's what you said, but you can't

4   remember saying it in the deposition she

5   was fired for a Workers' Compensation

6   claim.

7   A.    What I recall, a Workers'

8   Compensation anytime someone work -- I

9   mean, have an accident is what the company

10  says.  I mean, it's Workman Comp.

11  Q.    All right.

12  A.    That's my definition when someone

13  file.

14  Q.    But what I'm asking you is, if you

15  can remember testifying in that deposition

16  she was fired for having a Workers'

17  Compensation claim?

18  A.    I can't recall.  It's been a while

19  back.

20  Q.    Okay.  Again, other than the

21  conversation you had with Mike York when

22  you called him before the depo, before

23  your deposition in Marie Gibson's case, no

24  one ever talked to you about what to say

25  in your deposition.

42b36050-e494-40fc-b446-c4ca426e2e0f

1  A.    No, sir.

2  Q.    All right.  And when you testified

3  in Marie Gibson's case you understood that

4  you were under oath and that you were

5  telling the truth; correct?

6  A.    Yes, sir.

7  Q.    And you did tell the truth in the

8  deposition.

9  A.    Yes, sir.

10  Q.    All right.  Now Mike York, at no

11  time, ever told you to terminate

12  Ms. Gibson because she filed a Worker's

13  Compensation claim, did he?

14  A.    No.  He just terminate because it's

15  not the proper paperwork.  That's the

16  reason I terminated her.

17  Q.    And that's what you put on her Exit

18  Interview and that's what you said in your

19  deposition; correct?  You have to answer

20  out loud.

21  A.    Oh, okay.  Yes, sir.

22  Q.    Thank you.  I'm going to hand you --

23  I guess, eventually, we will mark this,

24  but this is -- for right now we'll just

25  refer to it, the copy of your deposition

1    from the Marie Gibson case taken on March

2    10th, 2010.  You have a copy of that

3    transcript; is that right, Mr. Shaw?

4    A.    Yes, sir.

5    Q.    Okay.  What I'd like you to do is go

6    to Page 47, Line 19.

7    A.    Okay.

8    Q.    The question is: " And Mike York

9    told you, and correct me if I'm wrong",

10   this is Marie Gibson's attorney, Workers'

11   Compensation attorney --

12   A.    Okay.

13   Q.    "that Marie Gibson had had an

14   accident on one of our forklifts and it's

15   going to be our policy that we fire people

16   that have accidents on the forklift.  Is

17   that --"  And then your answer is:  "No.

18   It's not a policy that -- whoever he

19   talked to, whoever he talked to, they want

20   to make sure they consistent throughout

21   the company, consistent throughout the

22   district."

23   A.    Uh-huh (affirmative response).

24   Q.    Okay.  And that accurately reflects

25   your testimony; correct?

 1          MS. McGEHEE:  I'm going to object

 2     to the form of the question.  The

 3     testimony speaks for itself and there's

 4     several questions that were posed to Mr.

 5     Shaw.  You can answer, if you can.

 6     BY MR. BEISER:

 7     Q.    Is that accurate?  Is that an

 8     accurate statement?

 9          MS. McGEHEE:  Did he read what's

10     on the paper?  That's what he's asking

11     you.

12          THE WITNESS:  Oh, yeah.

13     BY MR. BEISER:

14     Q.    Is what's on the paper, what I read,

15     is that accurate?

16     A.    Yeah.  I did tell him no, because

17     you got to be consistent in the district

18     and the region.

19     Q.    Right.  Okay.  And go to Page 48,

20     Line 20.

21     A.    Okay.

22     Q.    And the question is:  "What is the

23     consistency?"  You were questioned earlier

24     about "I was told to be consistent."  The

25     question is:  "What is the consistency?"

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 155

1   Your answer is:  "That if someone have an

2   accident on the vehicle and they not

3   certified like they suppose to, they

4   terminated."  Now, is that accurate?

5   A.    That's what I said about what Mike

6   told me, yes.  Going by what Mike told me

7   it is, going by what he told me.

8   Q.    Right.  At the time that you

9   terminated her.

10  A.    Huh?

11  Q.    At the time that you terminated her.

12  A.    That's what he -- I'm going by she

13  didn't have the proper paperwork on

14  file.

15  Q.    Right.  Okay.  If you go to Page 58,

16  Line 10, the question is:  "And it's your

17  understanding that the basis of her

18  termination", that's Ms. Gibson's

19  termination, "wasn't the fact that she had

20  an accident, it was the fact that she had

21  an accident on the forklift without the

22  presence of a certification of license to

23  be operating the forklift to begin with;

24  is that right?"  Your answer is:  "Right."

25  A.    Yeah, not having the proper

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 156

1    paperwork.

2    Q.    Right.  Now, is that any different,

3    your response there, is that any different

4    than what you put on Ms. Gibson's Exit

5    Interview that we've marked as Number

6    10?

7    A.    No.  It just stating what he said,

8    that she not -- for not having the proper

9    paperwork.  That's the reason we

10   terminating her.  I mean --

11   Q.    Right.  And what I'm asking you, is

12   the two parts of your testimony that we've

13   just read, in your mind, are they any

14   different than what you put on -- I'm not

15   talking about word for word.  I'm just

16   saying as far as the reason for

17   Ms. Gibson's termination, is --

18   A.    Not having the proper paperwork and

19   you gotta be consistent in the district

20   and the region.

21   Q.    Okay.  Now can you think of any

22   testimony that you gave in the -- in that

23   deposition that we've just been referring

24   to where you said that anything Wal-Mart

25   did was illegal related to Ms. Gibson?

1   A.    I can't recall, no, sir.

2   Q.    Okay.

3   A.    I can't recall.

4   Q.    After you finished this deposition

5   in Ms. Gibson's case did you feel like you

6   you had done anything wrong?

7   A.    I felt bad.

8   Q.    In what way?

9   A.    I still feel they shouldn't have

10  terminated her because Marie was a good

11  Associate.  She'd do anything you asked

12  her.  I mean, I felt bad for her.

13  Q.    Other than feeling bad that she had

14  been terminated, though, did you feel you

15  had done anything wrong in the

16  deposition?

17  A.    No, sir.  I feel I ain't did

18  anything wrong.

19  Q.    Do you know whether anyone at

20  Wal-Mart could have had any way to know

21  what you testified about in Ms. Gibson's

22  Workers' Compensation case deposition?

23  A.    Don't know.

24  Q.    Did it ever come up with anybody at

25  Wal-Mart, Mr. Doyle, Ms. Tidwell, Jahaine,

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 158

1   anybody, about --

2   A.    Don't know.

3   Q.    Do you know whether Dalton Doyle had

4   ever heard of Marie Gibson?

5   A.    Don't know.

6   Q.    All right.  How about Ms. Tidwell?

7   A.    Who is Tidwell?

8   Q.    I'm sorry, Jahaine, the HR person.

9   A.    Don't know.

10  Q.    But you say you didn't talk to

11  anyone about what you said in the

12  deposition.

13  A.    Correct.

14  Q.    All right.  Do you know if anybody

15  besides you had their deposition taken in

16  that case, in Ms. Gibson's case?

17  A.    No, sir.

18  Q.    You've never seen any other

19  depositions or heard about any other

20  ones?

21  A.    No, sir.

22  Q.    All right.  As we sit here today, do

23  you know of any law that Wal-Mart violated

24  in terminating Ms. Gibson?

25  A.    What you mean?

Page 159

1   Q.    You said you felt bad for her and

2   you don't think she should have been

3   terminated, but, as we sit here today, is

4   there any law that you're aware of that

5   you think Wal-Mart violated by terminating

6   her?

7   A.    I don't know if there's a law in

8   place or not.

9   Q.    Okay.  Are you aware of any kind of

10  law about what's called whistle blowing?

11  A.    I heard about it on the news.  You

12  know how they have it on the news and

13  stuff, whistle blowing.  That's all I

14  know.

15  Q.    Do you know anything more about it

16  other than just hearing about it on the

17  news?

18  A.    No.  Just on the news, no, sir.

19  Q.    Are you aware of anybody ever being

20  terminated at Wal-Mart for complaining

21  about anything illegal or wrong that was

22  done at Wal-Mart?

23  A.    I wouldn't know that anyway.  They

24  wouldn't give us that information, no,

25  sir.

1   Q.    You don't know why people are

2   terminated for any reason?

3   A.    No, sir.  They don't tell us.

4   Q.    Okay.  Based on these responses that

5   you gave at Page 48 and Page 58 of your

6   deposition, that if someone had an

7   accident on a vehicle and they're not

8   certified like they're suppose to be

9   they're terminated, can you think of any

10  reason why Wal-Mart would want to

11  terminate you for saying that?

12  A.    Because I'm telling the truth.

13  Q.    Okay.  But, if you already said it

14  on the Exit Interview, what about the

15  truthfulness of that statement

16  would -- would make Wal-Mart want to get

17  rid of you?

18        MS. McGEHEE:  You don't have to

19  tell him any of the discussions that I've

20  had with you.

21        THE WITNESS:  Okay.

22        MS. McGEHEE:  You're not -- Any

23  information that you got from me is not --

24  it's privileged and you don't have to tell

25  him.

1            THE WITNESS:  Okay.

2    BY MR. BEISER:

3    Q.    What I'm asking you -- I'm not

4    asking you for anything you got from your

5    attorney.  What I'm asking you is, very

6    simply, for making the statement that if

7    someone has an accident on a vehicle and

8    they're not certified like they're suppose

9    to be they're terminated.  What about that

10   statement would make Wal-Mart -- Why would

11   Wal-Mart want to terminate you for making

12   a true statement like that?  What's wrong

13   with that statement?

14   A.    What page?

15   Q.    Page 47, Line 20.  I'm sorry, 48,

16   Line 20.

17   A.    Okay.

18         (Witness reviewing deposition)

19   A.    They not being consistent --

20   Q.    Okay.  Can you explain that?

21   A.    -- in the company.  And I have no

22   way of knowing.  Anyone have an accident

23   on a forklift have they been terminated --

24   I mean, not -- Yeah, forklift, or heavy

25   equipment, being terminated.

1   Q.    Let me ask it to you this way.  Do

2   you think that if -- First of all, you

3   don't know whether anybody at Wal-Mart

4   knows that you made this statement --

5   A.    Don't know.

6   Q.    -- on Line 20.  You don't know.

7   Assuming that someone at Wal-Mart knew you

8   made this statement what my question is,

9   is what about this statement would -- Do

10  you think that this statement that you

11  made is the reason you were terminated?

12  Let me ask it that way.  In other words,

13  do you think you were terminated for

14  making this statement in your

15  deposition?

16  A.    I was terminated because of my

17  deposition.

18  Q.    Okay.  But I'm asking you

19  specifically about this statement at Line

20  20 through 22 on Page 48.

21  A.    Uh-huh (affirmative response).

22  Q.    Do you think you were terminated for

23  making that statement in particular?

24  A.    Don't know.

25  Q.    Okay.  I'm going to ask you to

42b36050-e494-40fc-b446-c4ca426e2e0f

1    assume that -- Well, let me ask it this

2    way.  Can you point to any testimony in

3    your deposition from March 10th, 2010,

4    where anything you said would be the basis

5    for Wal-Mart wanting to terminate you?

6    Can you point to anything you said in your

7    deposition?

8    A.    Yeah.  I can say by being consistent

9    in the district and the region, by being

10   consistent in the district terminating

11   someone.

12   Q.    Okay.  And do you think that's

13   illegal to be consistent in the district

14   or region for having -- for terminating

15   people for the same reasons?

16   A.    Illegal?

17   Q.    Right.  Is there something illegal

18   about that?

19   A.    You talking about being consistent,

20   and being consistent in a district and a

21   region --

22   Q.    Right.

23   A.    -- for having an accident on a

24   forklift?

25   Q.    Tell me what you're talking about

42b36050-e494-40fc-b446-c4ca426e2e0f

1    with being consistent and then we'll --

2    A.    What I'm talking about being

3    consistent is, like, the region's huge.

4    Q.    All right.

5    A.    So everyone have a forklift.  If

6    being consistent they ought to terminate

7    them for not having the proper paperwork

8    and stuff on file.

9    Q.    Okay.

10   A.    Had they been terminated, put it

11   like that.

12   Q.    Now if Wal-Mart terminates people in

13   the district or region for heavy equipment

14   accidents when they're not certified to

15   operate the heavy equipment in your view

16   is that illegal?

17   A.    Yes.  To me that's illegal.

18   Q.    And that's illegal because you don't

19   think anyone should ever be terminated --

20   A.    -- When working for a company.

21   Q.    Okay.  All right.

22   A.    Now they were -- No.  That's okay.

23   Q.    And do you think that your statement

24   that if someone has an accident on a

25   vehicle and they're not certified that

1   would be grounds for termination, do you

2   think that is, looking at that statement,

3   that would be a reason Wal-Mart would want

4   to fire you?

5   A.    Repeat that again.

6   Q.    Sure.  Your statement that if

7   someone has an accident on a vehicle,

8   they're not certified like they're suppose

9   to be, they're terminated.  Can you think

10  of a reason why Wal-Mart would want to

11  terminate you for making that statement?

12  A.    I guess because that statement I

13  said they feel that it's not the truth, at

14  Wal-Mart.

15  Q.    Are you just guessing?

16  A.    No.  Well, that's what -- That's

17  what I'm feeling, that, uh, that statement

18  that I gave in that, they probably feel

19  that what I said wasn't true.

20  Q.    Okay.  Now if you were to ask Mike

21  York why Marie Gibson was terminated do

22  you, based on your conversations with Mr.

23  York, know what he could say?

24  A.    He going to say because she didn't

25  have proper paperwork, got to be

1   consistent in the district and the region.

2   That's what he told me.

3   Q.    All right.  And, again, is there

4   anything wrong with that?

5   A.    You shouldn't terminate someone

6   because they had an accident.  Yes.

7   Q.    Whether or not they violated the

8   safety policies and certifications?

9   That's your opinion?

10  A.    Yes.

11  Q.    Okay.  But that's not a law that

12  you're aware of.

13  A.    Not that I'm aware, no.  I don't

14  know if there's a law or not.  I don't

15  know.

16  Q.    You just think it should be; yes?

17  A.    Yes, sir.

18  Q.    Okay.  Do you have any reason to

19  believe that -- Well, let me ask you this,

20  who, as far as you know, made the decision

21  to terminate you?

22  A.    Don't know.

23  Q.    Okay.  You don't know if it was

24  Dalton Doyle consulting with people above

25  him?

1   A.    Don't know.

2   Q.    As far as you know, from Wal-Mart,

3   your experience at Wal-Mart, if someone at

4   the Store Manager level is terminated who,

5   generally, would make that decision?  Do

6   you know?

7   A.    No.  We put it in the Market Office

8   hands.  Who tell them -- Who give them the

9   final decision, don't know.  Don't know.

10  Q.    But, if a Store Manager is going to

11  terminate a Co-Manager it's your

12  understanding he'd have to go up to the

13  Market.

14  A.    Right.  Yes, sir.

15  Q.    All right.  Do you have any evidence

16  that two or more people conspired to have

17  you terminated from Wal-Mart for doing

18  anything?

19  A.    I can't answer that.  I don't know

20  that.

21  Q.    All right.  And, so, obviously, then

22  your answer would be you don't know that

23  relating to conspiring to have you

24  terminated for the testimony you gave in

25  Ms. Gibson's case.

42b36050-e494-40fc-b446-c4ca426e2e0f

Page 184

1   A.   No one never sued me neither.

2   Q.   And you've never been convicted of

3   any crime?

4   A.   No, sir.  No, sir.

5   Q.   And you weren't in the military?

6   A.   No, sir.

7        MR. BEISER:  Can we take a five

8   minute break?

9        MS. McGEHEE:  Uh-huh (affirmative

10  response).

11             (Off the record)

12  BY MR. BEISER:

13  Q.   Now, Mr. Shaw, you have never, at

14  least relating to Marie Gibson, testified

15  before a public body conducting an

16  investigation, a hearing, or an inquiry

17  into any violation of law, have you?

18  A.   Repeat that again.

19  Q.   You never been called to testify at

20  a hearing --

21  A.   Oh, no.

22  Q.   -- or anything else --

23  A.   Oh, no.

24  Q.   The only thing you've testified is

25  the deposition; is that correct?

Page 185

1    A.    Yes, sir.

2    Q.    Okay.  And you have never objected

3    to, or refused to, participate in any

4    employment act or practice that you

5    believe was in violation of law; is that

6    right?

7    A.    Refused?

8    Q.    Right.

9    A.    No, sir.

10         MS. McGEHEE:  That wasn't the

11    whole question.  It was compound.  The

12    other part of that was objected to.

13         MR. BEISER:  Okay.

14    BY MR. BEISER:

15    Q.    Have you ever objected to

16    participating in an employment act or

17    practice --

18    A.    Oh, yes.

19    Q.    -- that you believe is a violation

20    of law?

21    A.    Yes.

22    Q.    That's the conversation you had with

23    Michael York.

24    A.    Mike, uh-huh (affirmative

25    response).

42b36050-e494-40fc-b446-c4ca426e2e0f

1  Q.   You've never refused to participate

2  in an employment act or practice that you

3  felt was in violation of law.

4  A.   And that was of my peers.

5  Q.   Right.  Okay.  And, as far as you

6  know, relating to Ms. Gibson's matter, you

7  have never testified or furnished any

8  other information in an investigation or

9  proceeding relative to the enforcement of

10  any of the labor laws of the state of

11  Louisiana.

12  A.   To Marie?

13  Q.   Right.

14  A.   No, sir.

15  Q.   Or to anybody else.

16  A.   No, sir.

17  Q.   Okay.  And, as far as you know, you

18  have never had to oppose a practice that

19  you believe was discriminatory; in other

20  words, discriminatory under Louisiana law.

21  A.   Like discriminating against, or

22  something like that?

23  Q.   Right.

24  A.   Law that I know of, no.

25  Q.   Right, that you know of.